924 P.2d 534

STATE of Hawai'i, Plaintiff–Appellee,

v.

Timothy Lee GABALIS, Defendant–Appellant.

No. 18916.

Supreme Court of Hawai'i.

Sept. 4, 1996.

John H. Wright and Jean S. Moriki of Wright, Sullivan, Holquin & Moriki, on the briefs, Honolulu, for defendant-appellant.

Loren J. Thomas, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

Following a jury trial, defendant-appellant Timothy Lee Gabalis appeals his conviction of theft in the second degree and unautho-

rized control of a propelled vehicle. On appeal, Gabalis contends that the trial court (1) erred in ordering Gabalis to provide a fingerprint exemplar from Gabalis during trial and (2) abused its discretion when it denied Gabalis's motion for new trial based upon juror misconduct. For the reasons discussed below, we affirm.

## I. BACKGROUND

On August 3, 1994, Gabalis, masquerading as a police officer, drove alongside a vehicle operated by Yosuke Aihara, a Japanese tourist, demanding Aihara's driver's license. Believing that Gabalis was, in fact, a police officer, Aihara stopped his vehicle. When Gabalis approached him, Aihara began removing his driver's license from his wallet in order to comply with Gabalis's instruction. However, before Aihara could remove his license from his wallet, Gabalis snatched the wallet, returned to his vehicle, and drove away.

Realizing that he had been duped, Aihara followed Gabalis. Heavy traffic slowed Gabalis's escape, allowing Aihara to catch up. Stuck in traffic, Gabalis abandoned his vehicle, a stolen van, and escaped on foot. When police arrived, they recovered various items from the interior of the van, including drugs and drug paraphernalia. Police also recovered several fingerprints from the van.

Gabalis was arrested approximately twenty-four hours later, on August 4, 1994, at the "Airport Hotel,"[1] and was subsequently charged with theft in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 708–831 (1993),[2] and unauthorized control of a propelled vehicle, in violation of HRS § 708–836 (1993).[3] At trial, which commenced on January 11, 1995, Gabalis relied upon an alibi defense, claiming that he was at "Hawaiian Brian's" and "Sharkey's"[4] at the time of the crimes.

At the conclusion of the first day of trial, the court learned that the prosecution's fingerprint expert was unable to compare the fingerprints taken from the van with the fingerprint exemplar taken of Gabalis at the time of his arrest because the latter was smudged. The prosecution explained that it could have its fingerprint expert either (1) compare the fingerprints recovered from the van with fingerprints taken from Gabalis as a result of a July 1994 arrest, or (2) take new fingerprints from Gabalis and compare those fingerprints with the fingerprints recovered from the stolen van. Gabalis objected to the use of the July 1994 fingerprint exemplar on the basis that the prior arrest would alert the jury to his prior bad acts. To assuage Gabalis's concerns, the court offered to delete from the July 1994 exemplar all reference to the circumstances under which it was obtained. Nevertheless, Gabalis persisted in his objection and, accordingly, the prosecution moved to compel Gabalis to provide another fingerprint exemplar. Over Gabalis's objections, the court ordered Gabalis to provide another fingerprint exemplar.

On January 17, 1995, the jury found Gabalis guilty as charged. Thereafter, on or about February 2, 1995, Deputy Prosecuting Attorney Ted Yamada received an anonymous letter, purportedly authored by a juror in Gabalis's trial. The letter to Yamada read in pertinent part:

> I know this was the very first trial you prosecuted. It was also the first time I

---

1. Although the "Airport Hotel" is actually the Airport Holiday Inn Hotel, we refer to that hotel as the "Airport Hotel" for purposes of clarity because the parties and the trial court consistently use that term.

2. HRS § 708–831, theft in the second degree, provides in pertinent part: "(1) A person commits the offense of theft in the second degree if the person commits theft: (a) Of property from the person of another.... (2) Theft in the second degree is a class C felony."

3. HRS § 708–836 provides in pertinent part:
   **Unauthorized control of propelled vehicle.** (1) A person commits the offense of unauthorized control of a propelled vehicle if the person intentionally exerts unauthorized control over another's propelled vehicle by operating the vehicle without the owner's consent....
   (2) "Propelled vehicle" means an automobile, airplane, motorcycle, motorboat, or other motor-propelled vehicle.
   ....
   (4) Unauthorized control of a propelled vehicle is a class C felony.

4. "Hawaiian Brian's" and "Sharkey's" are billiard parlors located in downtown Honolulu.

was ever selected to be a juror. I was told that when the trial was over we (the jurors) would have a chance to speak with the judge and ask her questions and possibly have a chance to speak with the attorneys. Circumstances prevented either of that from happening, so I would like to offer you the following comments:

. . . .

6. What kind of drugs were found in van—crystal methamphetamine, crack? What are the effects of crystal meth or crack? (testimony from an expert about effects such as becoming addicted, staying up all night (like the defendant said he had from 8/2/94 a.m. to 8/3/94 a.m.)).

7. *Hawaiian Brian's and Sharkey's— What kind of places are these? Found out from other juror that these places are drug user hangouts.* When the defendant said he had stayed up from 8/2/94 a.m. to 8/3/94 a.m. and that he hung out at Sharkey's and Hawaiian Brian's, *the jurors did not make the connection that he may have been on drugs until that one juror told us what kind of places those hangouts were.*

8. *The defendant was at an airport hotel when picked up. For what purpose? Found out from same juror that this is where some people go to deal in drugs or to do drugs safely, out of the public's eye.* This didn't come to mind until this juror pointed it out.

(Emphases added).

Relying on the letter from the anonymous juror, Gabalis filed a "Motion for a New Trial or in the Alternative an Individual Voir Dire of the Jury" on February 17, 1995. Gabalis maintained that:

In the letter the juror alluded to many allegations that were not brought out during trial, or if they were revealed should have been excluded in Motion in Limine Number 1.[5] Mainly, the author alleges

that "drugs" were found in the van and that he heard from another juror that Hawaiian Brian's and Sharkey's were places where "drug users hang out."

With respect to the reference that "'drugs' were found in the van," we note that, at trial, it was Gabalis's counsel—through the cross-examination of HPD Officer Beatty—who elicited testimony that drugs and drug paraphernalia were found inside the van:

Q. [By defense counsel] [W]hat precisely was . . . discovered in the van?

A. [Officer Beatty] You mean all the property within?

Q. All the property in the van.

A. Well, there was numerous clothing, . . . there's a gold badge, there was some state I.D., there was a pair of handcuffs, there was drug paraphernalia, there was drugs, just miscellaneous other items, bags and so forth.

Prior to trial, the circuit court had granted Gabalis's motion in limine, seeking to preclude any mention of the fact that drugs were found in the stolen van, acknowledging that such information was irrelevant to the offenses charged. Thus, the jury would not have known that drugs were found inside the van but for defense counsel having inadvertently elicited that information.

On March 20, 1995, the trial court denied Gabalis's motion for a new trial as premature and granted his motion for an individual voir dire of the jury. Thereafter, on March 24, 1995, the trial court conducted a hearing, at which time the jurors were individually questioned regarding the nature of their discussion(s) concerning Hawaiian Brian's, Sharkey's, and the Airport Hotel. One of the jurors [hereinafter, Juror X][6] testified as follows:

Q. [By the court] During the course of deliberations, did you make any statements regarding any of the following

---

5. On January 9, 1995, Gabalis filed a motion in limine (Motion in Limine # 1) seeking an order from the court "barring and prohibiting the State from eliciting evidence regarding any prior arrests or convictions of the Defendant. . . ." The motion included a request to prohibit any testimony or evidence with respect to "any alleged

drug usage by the defendant." The motion was orally granted the same day.

6. We note that, during the post-trial voir dire of the jury, Juror X was identified as the "one juror [who] told us what kind of places those hangouts were[,]" referred to in the anonymous letter.

places: Hawaiian Brian's, Sharkey's or the Airport Hotel?

A. [By the juror] Yes.

Q. [W]hat statements do you recall making with respect to these places and we'll take them one at a time. Hawaiian Brian's?

A. Hawaiian Brian's, um, a lot of younger people, adolescents, a lot of the older people mainly dealing with drugs.

And Sharkey's, not too much, just generally pool hall, open twenty four hours. Just somewhere someone can hang out all night.

And as to the . . . Airport Hotel, from my back knowledge, just that if you're not tourist then people party there and in high school a lot of people around me used to rent out rooms there in order to party like after prom, whatnot.

Q. [D]o you recall how often you made these statements?

A. Could be two or three times.

Q. [A]nd do you recall how long these statements were?

A. Short, brief.

On April 5, 1995, the trial court issued "Findings of Fact, Conclusions of Law [(COL)] and Order Denying Defendant's Motion For a New Trial." The court concluded that "the defendant has not shown a deprivation which could have substantially prejudiced his right to a fair trial." COL 20.

On April 11, 1995, Gabalis was sentenced to five years probation for the offense of theft in the second degree and five years probation for the offense of unauthorized control of a propelled vehicle, terms to be served concurrently. This timely appeal followed.

## II. *DISCUSSION*

On appeal, Gabalis contends that the trial court (1) erred in ordering Gabalis to provide a fingerprint exemplar during trial, and (2) abused its discretion when it denied Gabalis's motion for a new trial based upon juror misconduct.

### A. *Motion to Compel Fingerprint Exemplar*

On the date of the theft, August 3, 1994, Honolulu Police Department (HPD) Officer Kelly Pahio recovered several fingerprints from the stolen van. As previously stated, the fingerprint exemplar provided by Gabalis on the day of his arrest was smudged. Although the record is not clear on this point, it appears that HPD Sergeant Russell Crosson's conclusion that the fingerprint recovered from the left rear door of the van (Exhibit 6) matched Gabalis's fingerprints was arrived at by comparing Exhibit 6 with a fingerprint exemplar obtained in connection with Gabalis's July 1994 arrest on an unrelated charge.

As previously stated, because the prosecution's fingerprint expert, Sergeant Crosson, was unable to utilize the smudged fingerprint exemplar, the prosecutor suggested that Sergeant Crosson compare the fingerprints recovered from the van with either (1) Gabalis's July 1994 fingerprint exemplar, or (2) a replacement exemplar. However, because Gabalis objected to Sergeant Crosson utilizing the July 1994 fingerprint exemplar as it would have alerted the jury to his prior bad acts, *see* Hawai'i Rules of Evidence (HRE) 404(b), the prosecution requested an order from the court requiring Gabalis to provide another fingerprint exemplar:

MR. YAMADA: Your Honor, State would be asking that the Court allow the State to take an exemplar of the defendant, Your Honor.

THE COURT: Okay. As I believed we discovered yesterday afternoon when Sergeant Crosson came in with the fingerprint cards, we discovered that the fingerprints that were taken of the defendant on August 4th when he was arrested for these matters has a problem in terms of allowing Sergeant Crosson or any expert, for that matter, to make some identification. Apparently, there's smudges on the one print that is the clearest from State's Exhibit 6, and so that was the basis upon which Sergeant Crosson used the July 1994 arrest fingerprints. And as I've said to counsel in our discussions, you can either agree to stipulate to use the July 1994

fingerprints, and the State will avoid mentioning any date of those fingerprints or you can have the defendant submit to taking another set of prints today.

MR. HOLQUIN [Gabalis's attorney]: Okay. Your Honor, we would object to taking any more exemplars of the defendant's prints simply because the rule, Rule 16 allows for tests for purposes of identification to be taken by the prosecutor upon written request by the prosecutor and notice and time of the test to be taken, notice to the defense counsel.

Over Gabalis's objection, the trial court ordered. Gabalis to provide a new fingerprint exemplar. Later that day, Sergeant Crosson compared the fingerprint exemplar given at trial to Exhibit 6 and concluded that there was "no doubt" that Gabalis's fingerprints matched those recovered from the van.

■■■ On appeal, Gabalis argues that the trial court's order requiring him to provide fingerprint exemplars during trial violated Hawai'i Rules of Penal Procedure (HRPP) Rule 16(c)(1). HRPP Rule 16(c)(1), a discovery rule, provides:

*Submission to Tests, Examinations or Inspections.* *Upon written request* of the prosecutor, the court may require the defendant:

(i) to perform reasonable acts or undergo reasonable tests for purposes of identification; and

(ii) to submit to reasonable physical or medical inspection or examination of the defendant's body.

Reasonable notice of the time and place for such tests, inspections or examinations shall be given by the prosecutor to the defendant and the defendant's counsel who shall have the right to be present.

(Emphasis added). The procedure specified in HRPP Rule 16(c) is inapplicable to the present case because the prosecution's request for another exemplar cannot, under the circumstances of this case, properly be termed a request for discovery. "Discovery" is, "[i]n a general sense, the ascertainment of that which was previously unknown; the disclosure of coming to light of what was previously hidden." *Black's Law Dictionary,* 466

(6th ed.1990). Here, the prosecution already had a set of Gabalis's fingerprints which could have, subject to certain limitations, been introduced into evidence at trial. The trial court's order compelling Gabalis to provide another exemplar was solely to accommodate Gabalis's concerns regarding the use of the 1994 exemplar.

■■■ In this case, the July 1994 fingerprint exemplar formed the basis of Sergeant Crosson's conclusion that the fingerprints recovered from the stolen van matched Gabalis's fingerprints; the July 1994 exemplar, therefore, was foundational evidence for Sergeant Crosson's testimony. If, as the court proposed, all references to the date and circumstance under which the July 1994 exemplar was obtained were deleted, the court could have properly allowed Sergeant Crosson to utilize the July 1994 exemplar in his testimony. *See, e.g., State v. Rodriguez,* 37 Conn. App. 589, 658 A.2d 98, 112 ("Under the principles of real or demonstrative evidence, authenticated fingerprints may be introduced into evidence and compared with other fingerprints found at or near the scene of a crime. The admission of a fingerprint record containing extraneous material which in itself is incompetent, however, may constitute reversible error depending on whether the evidence of past crimes has been masked or obliterated. Whenever a fingerprint card is introduced as evidence an implication of criminal history potentially arises, which, of course, should be dispelled[; therefore,] the better practice is to cover every questionable element of the card, including dates and other printed matter." (Quotation marks, ellipses, and citations omitted.)), *cert. denied,* 234 Conn. 916, 661 A.2d 97 (1995). The trial court's order compelling Gabalis to provide another exemplar was solely to accommodate Gabalis's concerns regarding alerting the jury to his prior bad acts.

Gabalis further argues that, by ordering him to provide a fingerprint exemplar during trial, the trial judge "became an advocate for the State and clearly became impartial [sic]." This contention is without merit. As previously stated, Gabalis objected to the use of the July 1994 exemplar because it would have alerted the jury to his prior bad acts.

*See* HRE 404(b). Gabalis's objection, however, is unfounded in light of the trial judge's offer to redact from the July 1994 exemplar any reference to the circumstances under which it was obtained, including the date it was provided. We believe that the trial court's order compelling Gabalis to provide another fingerprint exemplar during trial was a reasonable accommodation of Gabalis's concerns rather than an indication of any bias against him.

Finally, we discern no prejudice in the trial court's order requiring Gabalis to provide a fingerprint exemplar at trial; in particular, we do not believe that the trial court's order limited the effectiveness of Gabalis's cross-examination of Sergeant Crosson. Gabalis was notified prior to trial that Sergeant Crosson would testify, and Gabalis did not dispute the fact that his fingerprints matched the fingerprints that were recovered from the van, admitting that he once accepted a ride in the van from a friend. Gabalis' cross-examination of Crosson sought to establish that: (1) Sergeant Crosson could not establish *when* Gabalis left his fingerprint on the van; and (2) the police did not find any of Gabalis's fingerprints *inside* the van, that is, on the steering wheel or the driver's-side door. Thus, compelling Gabalis to provide another exemplar during trial did not damage the effectiveness of his cross-examination of Sergeant Crosson.

Based on the foregoing discussion, we discern no error in the trial court's order compelling Gabalis to provide a fingerprint exemplar at trial.

### B. *Motion For New Trial*

In his motion for new trial, filed on February 17, 1995, relying on the anonymous purported-juror's letter, Gabalis essentially maintained that he had not received a trial by a fair and impartial jury. On appeal, Gabalis contends that the trial court abused its discretion in refusing to grant his motion for new trial.

As a general matter, the grant or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. *See State v. Sugiyama,* 71

Haw. 389, 390, 791 P.2d 1266, 1267 (1990) (trial court abused discretion in denying motion for new trial); *Mehau v. Reed,* 76 Hawai'i 101, 112–13, 869 P.2d 1320, 1331–32 (Sup.1994) (no abuse of discretion in denying motion for new trial); *State v. McNulty,* 60 Haw. 259, 268, 588 P.2d 438, 445 (1978), *cert. denied,* 441 U.S. 961 [99 S.Ct. 2406, 60 L.Ed.2d 1066] (1979) (*id.*). The same principle is applied in the context of a motion for new trial premised on juror misconduct.

"The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *Kaneohe Bay Cruises, Inc. v. Hirata,* 75 Haw. 250, 258, 861 P.2d 1, 6 (1993). . . .

A fair trial by an impartial jury is guaranteed to the criminally accused by both the sixth amendment to the United States Constitution and article I, § 14 of the Hawai'i Constitution, as well as by principles of due process under both the state and federal constitutions. Because the right to an impartial jury in a criminal trial is so fundamental to our entire judicial system, it therefore follows that a criminal defendant is entitled to twelve impartial jurors. Thus, the trial court must grant a new trial if any member (or members) of the jury was not impartial; failure to do so necessarily constitutes an abuse of discretion.

*State v. Furutani,* 76 Hawai'i 172, 178–79, 873 P.2d 51, 57–58 (1994) (internal quotation marks and some citations omitted).

In *State v. Jackson,* 81 Hawai'i 39, 912 P.2d 71 (1996), we reiterated the analytical framework within which this court reviews challenges to a jury verdict based upon allegedly improper statements made by jurors during deliberations, stating:

In *Furutani, supra,* we addressed the general principles and the conceptual framework governing claimed denials of the right to a fair trial by an impartial jury. We explained that "[t]he defendant bears the initial burden of making a *prima facie* showing of a deprivation that could substantially prejudice [his or her] right to

a fair trial by an impartial jury." 76 Hawai'i at 181, 873 P.2d at 60. When a defendant makes ... a claim [that he or she has been deprived the right to a fair trial by an impartial jury],

> the initial step for the trial court to take is to determine whether the nature of the alleged deprivation rises to the level of being substantially prejudicial....

*Id.* at 180, 873 P.2d at 59. *When the alleged deprivation is based on statements made during deliberations, in order for the deprivation to rise to the level of being substantially prejudicial, a showing must be made "that improper juror comments during deliberations have been used as a circumstance against" the defendant.* If such a *prima facie* showing is made *by the defendant,*

> there is a presumption of prejudice and the verdict will be set aside unless it is clearly shown that the juror's comments could not have affected the verdict. And consistent with our case law, the burden is on the prosecution to make such a clear showing beyond a reasonable doubt.

*Id.* at 48, 912 P.2d at 80 (emphases added) (some citations omitted) (some internal brackets in original).

The trial judge, at a hearing on a motion for new trial, acts as the trier of fact. In this jurisdiction, a trial court's [findings of fact] are subject to the clearly erroneous standard of review. A[ ] [finding of fact] is clearly erroneous when, despite evidence to support the finding, the appellate court is left with a definite and firm conviction that a mistake has been committed....

A [conclusion of law] is not binding upon an appellate court and is freely reviewable for its correctness. This court ordinarily reviews [conclusions of law] under the right/wrong standard. Thus, [a conclusion of law] that is supported by the trial court's [findings of fact] and that reflects an application of the correct rule of law will not be overturned. However, a [conclusion of law] that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.

*Furutani,* 76 Hawai'i at 179–80, 873 P.2d at 58–59 (citations and quotation marks omitted). Thus, pursuant to *Jackson* and *Furutani,* in order for a criminal defendant to make a *prima facie* showing that a juror's comment(s) during the jury's deliberations deprived him or her of the right to a fair trial by an impartial jury, the defendant must, by an *objective* evaluation of the comment at issue, *see* discussion at Section II.D.2 *infra,* show that: (1) the comment was improper; and (2) the comment was used as a circumstance against the defendant. We examine each of these requirements in determining whether Gabalis has met his burden in making the requisite *prima facie* showing.

### 1. Whether Juror X's comments were improper

■ Unlike an insinuation of racial prejudice (as in *Jackson*) or a comment regarding a defendant's failure to testify (as in *Furutani*), Juror X's comments regarding her impression of Hawaiian Brian's, Sharkey's, and the Airport Hotel were not improper. It is perhaps inevitable that, during jury deliberations, jurors may verbalize, based on their background and experiences, their perceptions regarding certain establishments or locations mentioned at trial. Illustratively, Hotel Street in downtown Honolulu is commonly known by members of our community to be associated with criminal activity. If a defendant were tried by a jury for a crime that was committed on Hotel Street, it would not be unlikely for one or more jurors to comment during deliberations about Hotel Street's reputation. We believe that information regarding the reputation of an establishment or a community location is, in and of itself, insufficiently prejudicial to warrant the grant of a new trial.

### 2. Whether Juror X's comments were used as a circumstance against Gabalis

■ Even were we to assume, *arguendo,* that Juror X's comments were improper, there is no indication that Juror X's com-

ments were used as a circumstance against Gabalis.

We recognize that the anonymous juror's letter—assuming the letter was indeed written by a juror in this case [7]—demonstrates that at least one juror arguably used Juror X's comments as a circumstance against Gabalis. Specifically, Juror X's comments caused the anonymous juror to speculate regarding the possibility of Gabalis's drug use during the period in question as a result of Gabalis's admission that he frequented the establishments that Juror X associated with drug use, coupled with the evidence regarding drugs and drug paraphernalia having been found in the stolen van. However, in considering whether Gabalis was entitled to a new trial premised upon alleged juror misconduct, we are required, pursuant to HRE 606(b), to disregard the anonymous juror's remarks regarding his or her *subjective* mental processes. HRE Rule 606(b) (1993) provides in pertinent part:

> **Inquiry into validity of verdict or indictment.** Upon an inquiry into the validity of a verdict . . ., a juror may not testify concerning the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith.

The commentary to Rule 606(b) explains the values sought to be protected by the rule and the matters to which jurors may testify:

> Under traditional English common law, the general competency of a juror to testify as a witness had one limitation: he [or she] was barred from giving testimony to impeach his [or her] own verdict. See McCormick § 68; *Vaise v. Delaval,* 1 T.R. 11, 99 Eng. Rep. 944 (K.B.1785). "The values sought to be promoted," according to the Advisory Committee's Note to the original proposal for federal Rule 606(b), "include freedom of deliberation, stability and finality of verdicts, and protection of jurors against annoyance and embarrassment." However, the blanket prohibition also bars testimony relevant to misconduct,

irregularities, and improper influences external to the process of deliberation. The intent of this subsection is to strike a proper balance by *excluding testimony relating to the internal deliberative process* and allowing testimony about *objective misconduct* and irregularities. No attempt is made to specify substantive grounds for setting aside verdicts.

> The Advisory Committee's Note to the original federal proposal, upon which subsection (b) is modeled, said: "The trend has been to draw the dividing line between testimony as to mental processes, on the one hand, and as to the existence of conditions or occurrences of events calculated improperly to influence the verdict, on the other hand, without regard to whether the happening is within or without the jury room. . . . The jurors are the persons who know what really happened. *Allowing them to testify as to matters other than their own reactions* involves no particular hazard to the values sought to be protected. The rule is based upon this conclusion." For example, under this rule jurors would be competent to testify to the consumption of alcoholic beverages by deliberating jurors, a matter which under some circumstances may be cause for setting aside a verdict, see *Kealoha v. Tanaka,* 45 H. [Haw.] 457, 370 P.2d 468 (1962).

HRE 606(b) Commentary (emphases added) (ellipses in original). Pursuant to Rule 606(b), neither the trial court nor this court on appeal may consider the anonymous juror's remarks regarding the effect that Juror X's statements had on his or her deliberative processes. Thus, implicit in *Jackson* is the proposition that the defendant must make a *prima facie* showing "that improper juror comments during deliberations have been used as a circumstance against" him or her based exclusively upon an *objective* evaluation of the juror's comment(s) at issue.

For example, in *Bibbins v. Dalsheim,* 21 F.3d 13 (2d Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 261, 130 L.Ed.2d 181 (1994), the defendant (Bibbins) sought to set aside his

7. During the post-trial voir dire of the jury, no juror was asked whether he or she wrote the letter, and no juror acknowledged writing the letter.

drug-related convictions on the basis of juror misconduct.

A few minutes after a street sale of cocaine to an undercover agent, police spotted Bibbins across the street and arrested him because he fit the description of the seller. One juror told the others that she was a resident of the area in which the transaction and arrest took place and that there were no open places of business there. Bibbins offered proof that this statement influenced at least one other juror to render a guilty verdict on the theory that the absence of other people made the street identification of the defendant more compelling.

*Id.* at 14.

The "proof" offered by the defendant consisted of affidavits from two of the jurors from Bibbin's trial.

Juror Eileen Krainak averred that, in discussing the accuracy of [the police officer's] identification of Bibbins, she had told the other jurors that she had lived in the . . . area [of the arrest] and that there were no open businesses in the vicinity of the spot where the drug transaction took place. In her affidavit, Krainak also gave her impression of what evidence had been adduced at trial on this issue, described the impression her statement made on the other jurors, and gave the tally of the jury's votes before and after she made it. The affidavit of juror John Urban confirmed Krainak's affidavit in all these respects, and described the effect that the extra-record information had on his vote.

*Id.* at 15–16. Before addressing whether Krainak's observations were sufficiently prejudicial to warrant a new trial, the court noted that, because the determination of prejudice is an objective one, "Mr. Urban's affidavit is therefore inadmissible to the extent that it recounts how Ms. Krainak's disclosure affected the thinking and voting of individual jurors or the deliberations of the jury as a whole, including the tally of votes." *Id.* at 17.

Likewise, in the present case, even assuming the authenticity and source of the letter, we must disregard the anonymous juror's remarks regarding how his or her mental process was affected by Juror X's comments. Thus, having assumed for purposes of this discussion that Juror X's comments were improper, the question narrows to whether an objective evaluation of the record indicates that Juror X's comments were "used as a circumstance against" Gabalis. The trial court concluded that "little or no weight was accorded by the jurors concerning the nature of these locations." We agree.

The individual voir dire of the jurors reveals that three of the jurors did not recall any discussion regarding Hawaiian Brian's, Sharkey's, or the Airport Hotel. Of the nine jurors who recalled discussions concerning the nature of those establishments, one juror recalled that the discussions occurred after the jury had reached a unanimous verdict. Of the remaining eight jurors, seven jurors testified that their discussions concerning these matters were "brief," lasting fewer than five minutes out of the approximately three and one-half hours the jury spent during deliberations, and the remaining juror testified that the discussions lasted less than ten minutes.

Specifically, following the individual voir dire of the jurors, the trial judge made the following findings:

38. Juror [No. 2] recalled another juror making general statements concerning Hawaiian Brian's, Sharkey's and the Airport Hotel. Juror No. 2 recalls all three places being discussed as places where there is "drug activity" and "things of that nature." Juror No. 2 described the discussions concerning these statements as "not brief" but "not lengthy" and at least more than five minutes. Juror No. 2 recalls discussion concerning this matter twice.

39. Juror [No. 1] recalled hearing statements about Sharkey's as an "undesirable" place. However, Juror No. 1 recalls these statements being made only after the jurors had already reached a unanimous verdict and the verdict had been received by the court. Juror No. 1 recalled the statement as part of a very short discussion, lasting approximately five minutes.

40. Juror [No. 3] recalled hearing statements about Hawaiian Brian's and the Airport Hotel as places linked to "drugs." Juror No. 3 recalls at least two jurors and possibly three jurors making these statements. Specifically, Juror No. 3 recalls that one juror made the statement and then other jurors "chiming" in, confirming that they had the same impression of those places. The statements were not very long, lasting only a couple of minutes in duration. Juror No. 3 recalls the statements being made during deliberations.

41. Juror [No. 4] did not recall any jurors making any statements about any of these places or any references to the defendant frequenting any "drug user hangouts."

42. Juror [No. 5] recalled either one or two jurors making statements that Hawaiian Brian's, Sharkey's and the airport hotel were "places frequented by drug users." Juror No. 5 recalls the three places being discussed separately with each discussion lasting less than ten minutes. Juror No. 5 recalls a juror making a statement about the particular location and then other jurors raising questions about the statements.

43. Juror [No. 6] recalls one or two jurors discussing both Hawaiian Brian's and Sharkey's being described as a place "where alot [sic] of kids hang out and do alot [sic] of drugs." Juror No. 6 described these discussions as being separate but "real short" and made only once. Juror No. 6 did not recall any statements made about the airport hotel.

44. Juror [No. 7] testified that she made the following statement about Hawaiian Brian's[:] a place where "alot [sic] of young people, adolescents, alot [sic] of the older people mainly dealing with drugs." Juror No. 7 also described Sharkey's as a "pool hall, open twenty four hours ... where someone can hang out all night." Juror No. 7 also described the Airport Hotel as a place where "people party." Juror No. 7 believes she made the statements two or three times and that they were "short, brief." At the time Juror No. 7 made the statements, she is not sure if all twelve jurors heard her statements. Juror No. 7 believes that five individuals heard her directly. Juror No. 7 did not hear any other juror make similar statements. Juror No. 7 testified that she herself had been to Hawaiian Brian's on several occasions.

45. Juror [No. 8] recalled all three locations being discussed as a result of the drug paraphernalia being found in the van. However, Juror No. 8 did not recall any discussion relating to drug use.

46. Juror [No. 9] did not recall any discussions about Hawaiian Brian's, Sharkey's or the airport hotel, other than what was presented at trial.

47. Juror [No. 10] recalled one juror stating that Hawaiian Brian's was "a twenty four hour place ... where alot [sic] of young people hang out ... something to do with drugs ... a twenty four hour place that people who were doing certain kinds of drugs might go to stay up all night." Juror No. 10 characterized these statements as brief. Juror No. 10 also recalls the same juror making a similar statement about Sharkey's which could have been made at the same time as the statement relating to Hawaiian Brian's and which was also brief. Juror No. 10 also recalls the same juror making a statement about the airport hotel as a place to "maybe do drugs." This was also a "brief" statement.

48. Juror [No. 11] recalled one juror making a statement which lasted a minute and a half concerning Hawaiian Brian's to the effect "that people who use drugs hang out there." Sharkey's was also discussed as being the same kind of place. Juror No. 11 also recalls the airport hotel being discussed as a place where reservations were not required in advance.

49. Juror [No. 12] recalls possibly two jurors discussing all three places at the same time as "drug user hang outs." These statements were very brief and "didn't mean much."

Moreover, as previously stated, no evidence regarding drugs or drug use would have been adduced at trial but for defense

counsel's cross-examination of Officer Beatty. Evidence of drug use was irrelevant because, even if the drugs could somehow be attributed to Gabalis, such evidence did not have any bearing on whether Gabalis stole the van or Aihara's wallet.

Thus, even if we were to assume that Juror X's comments were improper, an objective evaluation of the record supports the trial court's conclusion that those statements were not used as a circumstance against Gabalis. Accordingly, we hold that it was not an abuse of discretion for the trial court to deny Gabalis's motion for a new trial.

## III. *CONCLUSION*

For the foregoing reasons, we affirm Gabalis's convictions for theft in the second degree and unauthorized control of a propelled vehicle.