936 P.2d 1297

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Craig NAPULOU, Defendant–Appellant.**

**No. 17653.**

Intermediate Court of Appeals of Hawai'i.

April 9, 1997.

Reconsideration Denied April 28, 1997.

Certiorari Denied May 20, 1997.

Joyce Matsumori–Hoshijo, Deputy Public Defender, on the brief, Honolulu, for defendant-appellant.

Caroline M. Mee, Deputy Prosecuting Attorney, City and County of Honolulu, on the brief, Honolulu, for plaintiff-appellee.

Before BURNS, C.J., and WATANABE and KIRIMITSU, JJ.

BURNS, Chief Judge.

Defendant Craig Napulou (Napulou) appeals from the November 22, 1993, Judgment finding him guilty of Attempted Murder in the Second Degree, Hawai'i Revised Statutes (HRS) §§ 705–500 and 707–701.5(1) (1993) (Count I), Burglary in the First Degree, HRS § 708–810(1)(c) (1993) (Count II), and Assault in the Second Degree, HRS § 707–711(1)(d) (1993) (Count III), and sentencing him for Count I to incarceration for life with the possibility of parole, for Count II to incarceration for ten years, and for Count III to incarceration for five years, all terms to run concurrently. We affirm.

On November 20, 1991, a grand jury indicted Napulou for the above offenses. The charges stemmed from a stabbing and slashing of two Japanese tourists who stumbled upon a burglar in their Waiki'ki' vacation rental. On April 27, 1993, Napulou filed a Notice of Alibi Defense. The jury trial began on September 9, 1993. Defense counsel's opening argument indicated that Napulou was asserting an alibi defense.

In this appeal, Napulou contends that the trial court reversibly erred when it: (1) denied Napulou's motion seeking a mistrial because a discussion the jurors had regarding Napulou's family tainted the jury; (2) allowed the State to cross-examine Napulou about whether he told his family or his girlfriend's family that he had been working on the day of the offenses; and (3) overruled Napulou's objection to the prosecutor's comment, during closing argument, on Napulou's failure to call corroborating witnesses.

## DISCUSSION

### A. *Juror Tainting by Outside Influences*

On September 20, 1993, the second day of jury deliberations, some of the jurors had a brief discussion before lunch about the possibility that members of Napulou's family had followed them from the courtroom to the parking area and whether there was any need for additional courthouse security. After lunch one of the jurors, either No. 12 or No. 2, asked the bailiff about courthouse security or protection for the jurors. The bailiff instructed the jurors not to discuss the matter among themselves and said that he would ask the court about their concerns. The jury continued to deliberate. The court, without consulting counsel, instructed the bailiff to tell the jurors to frame their concerns in a written communication to the court.

Later that same day, the court received Communication No. 2, written by jurors Nos. 9 and 12, which read as follows:

Some jurors have noticed members of [Napulou's] family following them downstairs and toward the car garage. If a

guilty verdict is given[,] could there be danger to some of us or has some arrangement been made for protection. (More than one juror)

After consulting with counsel, the court then conducted a *voir dire* of each juror to determine whether the jurors had experienced being followed by Napulou's family members, whether they had discussed such an experience with other jurors, whether the incidents and/or the discussion affected the ability of any juror to be fair and impartial, and whether the jurors could consider only the evidence and the law and deliberate fully and fairly. Napulou and his counsel were present in court during the hearing.

The *voir dire* of individual jurors was conducted outside of the presence of the other jurors. When asked whether they had experienced being followed or whether they had any concerns, the jurors responded as follows:

*Juror No. 1:* "No."

*Juror No. 2:* "No, I don't think anybody followed me, no, but you know ... I was a little uncomfortable to tell you the truth. ... Well, because when we were waiting outside, they're right there, and they would watch us pretty intently, and sitting up here sometimes, you know, if I looked, then somebody's always looking, you know, so I just felt uncomfortable, you know. ... I just said I felt a little uncomfortable sometimes."

*Juror No. 3:* "No, your hono[r]."

*Juror No. 4:* "No, I did not."

*Juror No. 5:* "No."

A follow-up colloquy occurred between defense counsel and juror No. 5:

[Q]: Was [sic] there any comments or looks or things that made you feel uncomfortable?

Juror [No. 5]: No verbal, no communication at all. They were just sitting downstairs.

[Q]: Nothing that made you feel intimidated?

Juror [No. 5]: No.

\* \* \*

[Q]: And with respect to the concerns of the others, does that make you feel uncomfortable for them, like maybe they're having difficulty at this point in time?

Juror [No. 5]: I think they were just concerned that people were there from the time we were selecting the jurors and they could recognize us anywhere, and I believe one person lives in the area that Mr. Napulou's family lives.

[Q]: And which person was that?

Juror [No. 5]: That would have been [No. 12], and [No. 9] ... I think she lives in that area, also.

*Jurors Nos. 6 and 8:* "No."

*Juror No. 7:* "No, I haven't. I've noticed the defendant's family when you go to smoke break, but I haven't felt that they were following us, just happened to be going to the same places."

*Juror No. 9:* "Actually not. The first thing I, the first time it was brought up I mentioned it to my mom I was going to jury duty, and she says[,] 'What's going to happen?' But she lives in California, and I said, 'I've never heard anything like that in Hawaii [Hawai'i], don't worry about it.' And so I didn't think of anything at all until it was brought up again today."

*Juror No. 10:* "No. I saw the family here about the courtroom and I had no problem with it whatsoever."

*Juror No. 11:* "No."

*Juror No. 12:* "No, I didn't ... but some of us were just wondering, you know, what might happen. I guess we hear it on T.V. and stuff, you know, and we just kind of were wondering."

When asked whether there was a discussion about this in the jury deliberation room, the jurors said:

*Juror No. 1:* "Not really a discussion. I think the question was just posed, you know, somebody had just questioned it, and they wrote it out to give to the bailiff."

*Juror No. 2:* "A little, because we didn't realize we weren't supposed to talk about it until [the bailiff] told us just write it down, don't talk about it, so we talked a little about it."

*Juror No. 3:* "It was brought up at one time."

*Juror No. 4:* "Yes, it was . . . [j]ust as it was stated on the piece of paper."

*Juror No. 5:* "Yes, it was."

*Juror No. 6:* "Yes . . . it was a brief discussion. It wasn't during the deliberation, it was before we had really started the deliberation on the issues. . . . Nobody was talking about it in terms of deciding one way or another. They were just talking in general, you know, could something happen to somebody, but it was not in the context of should we decide this or decide that. We were not at that point."

*Juror No. 7:* "No, except the people that raised the initial question[.]"

*Juror No. 8:* "Yes, sir."

*Juror No. 9:* [Question not asked.]

*Juror No. 10:* "No. There were, you know, a few comments around the table, but I didn't notice any discussion at great length or any great concern."

*Juror No. 11:* "I think I was in the bathroom when they discussed it, well, when they talked about it. Well, I came in and I heard sort of the ending of the conversation."

*Juror No. 12:* "Yes. . . . I discussed this along with other jurors . . . mostly females."

When asked which of the jurors had the main concerns or who brought it up, the jurors responded as follows:

*Juror No. 1:* "I think it was [No. 12]."

*Juror No. 2:* "[No. 12] . . . seemed really concerned."

*Juror No. 3:* "I don't know the individual's name. . . . Female."

*Juror No. 4:* "[No. 12] and . . . [No. 9]."

*Juror No. 5:* "I believe it was [No. 12]. . . . And I believe [No. 2] and [No. 9] also expressed it. I just mentioned that they were down there when I went downstairs, but no one's followed me."

*Juror No. 6:* "[No. 12], . . . but she didn't seem to specifically say anything had happened to her, she just wondered in general, could something happen, you know, I mean could something happen to someone, and the rest of us sort of said that's why we have a jury system, there's 12 of us, it's not just one person who decides, and that we're protected."

\* \* \*

"[I]t was a brief discussion. It wasn't during the deliberation, it was before we had really started the deliberation on the issues, and nobody—I felt we had resolved it, and they just thought maybe we should bring it up just in case."

*Juror No. 7:* "I know who she is but I can't remember her name or number right offhand."

*Juror No. 8:* "[No. 2]."

*Juror No. 9:* "I just know her first name is [No. 12]."

*Juror No. 10:* "I don't recall, one or two of the ladies."

*Juror No. 11:* "When I came in, I'm not sure who exactly was saying it, but one of the ladies[.]"

*Juror No. 12:* "I forgot their names. It's mostly females."

To follow up, juror No. 12 was asked the following questions by defense counsel:

[Q]: Okay. What about, do you feel uncomfortable where you live where there might be somebody in your area that might intimidate you or cause you to feel discomfort?

Juror [No. 12]: No. Basically the question arose because I guess, like I said, sometimes we see it on T.V. and stuff, and everybody was just wondering, you know, what if you know the person's family, or somebody might come up and ask us things or, you know, it's just a matter of speaking, you know, in there what if this and what if that, but actually we weren't, you know, bothered by anybody or anything like that.

[Q]: Okay. And it appears from your responses so far that this isn't affecting your ability to sit as a juror right now?

Juror [No. 12]: Oh, no, not at all.

[Q]: Any other concerns you have?

Juror [No. 12]: No.

[Q]: Who was it that you felt was speaking about this the most, if anybody?

Juror [No. 12]: It was myself and I think about three other ladies in there.

When asked whether they thought that they could continue to deliberate on the evidence fairly and impartially, and to follow the court's instructions, all jurors replied that they could.

Juror No. 9 was asked by defense counsel, "Do you feel that this will affect your ability to be fair and impartial to both sides in this case in any way whatsoever?" She replied,

No, because honestly I had not thought about it until they mentioned it again today, and, you know, that's the second time I heard it, one from my mother, and I put it out of my mind, so I think I'd just do the same thing. It's not something I was thinking about or greatly concerned about so—

On the following morning of September 21, 1993, Napulou moved for a mistrial:

THE COURT: Okay. [Defense Counsel], you had a motion?

[DEFENSE COUNSEL]: Yes, your Honor. After reconsidering what took place yesterday with the Jury Communication Number 2, which indicated that some of the jurors had said that members of my client's family had followed them down through the courthouse and apparently down towards the parking lot, and that they appeared to feel intimidated, though that wasn't the exact language, but that was the message being given to us because they want to know if there can be security and protection for those jurors afterwards, then we did our individual voir-dire of all the jurors, and there was not one single juror that said an incident like that took place.

After pondering that problem, I'm moving for a mistrial on the basis that we no longer have a fair and impartial jury panel, and the reason is is [sic] that the clear contradiction between the Communication Number 2 that was given to us and the indication that none of them said that would suggest that there is some sort of

dishonesty taking place someplace along the line.

. . . My belief, then, is that one of the jurors was not being honest with us on individual voir-dire, and if that's the case, then I don't have a fair and impartial panel there anymore, and I'm moving for a mistrial.

[THE PROSECUTOR]: We would object to the motion, your Honor. After extensive voir-dire of each juror they've all stated that they could be fair and impartial, and, in fact, this issue arose sort of in a general fashion and not of any particular concern. Each juror, I believe, has been open and candid about their feelings in this matter, and they all stated that they would be fair, impartial, and listen to the evidence and deliberate on the evidence without any outside influences. So we believe that there is no necessity to declare a mistrial.

THE COURT: Anything further, [Defense Counsel]?

[DEFENSE COUNSEL]: Yes. I recognize the fact that each and every one of them said that they could be fair and impartial, but since none of them owned up to this suspicious act, somebody following them down to the parking structure, which was the clear communication that we received, it would appear that at least one of them was being dishonest about that in one fashion or another, and therefore they could equally be dishonest with respect to the fact that they say they could be fair and impartial at this time, and on that basis I think this Court should grant the mistrial.

THE COURT: If there's nothing further, the Court is going to respectfully deny the motion for mistrial. If other problems come up, you will obviously have an opportunity to renew the same.

* * *

[DEFENSE COUNSEL]: . . . [O]ne of the factors that gives me concern was that we had to go through this individual voir dire before . . ., two of the jurors that are still on the panel were two of the jurors that we had to have individual voir-dire,

and we dismissed ... [original juror No. 2] because of her suspicions that someone was following her, uneasiness about my client's family. That was communicated to those two jurors, and not only what transpired yesterday but the cumulative effect I think is what I need to make with the record.

THE COURT: Let the record reflect that, ... the other jurors who were still on the jury who were interviewed, that was [No. 9]—

DEFENSE COUNSEL: No, it was [Nos. 4 and 11].

■■■ On appeal, a denial of a motion for mistrial will not be disturbed absent a showing of an abuse of discretion by the trial judge. *State v. Palabay*, 9 Haw.App. 414, 431, 844 P.2d 1, 10 (1992), *cert. denied*, 74 Haw. 652, 849 P.2d 81 (1993). "The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Furutani*, 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994) (citations omitted).

■■■ In this context, there is a similarity between a motion for a mistrial and a motion for a new trial under Hawai'i Rules of Penal Procedure Rule 33. At a hearing on a motion for new trial based on allegations that some of the twelve jurors were not impartial, or that a juror's comments during deliberations deprived a defendant of a fair trial, the trial judge acts as the trier of fact, *State v. Gabalis*, 83 Hawai'i 40, 46, 924 P.2d 534, 540 (1996) (citing *State v. Furutani*, 76 Hawai'i at 179–80, 873 P.2d at 58–59), and it is the right of the trier of fact to determine credibility and to weigh evidence. *Lono v. State*, 63 Haw. 470, 473, 629 P.2d 630, 633 (1981). Findings of fact are subject to the clearly erroneous standard of review.

A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with the

definite and firm conviction that a mistake has been committed.

*State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995).[1]

Napulou contends on appeal that because one or more jurors improperly commented or implied that Napulou's family members might have followed them to the parking area, or that Napulou's family might pose a danger to jurors if they found Napulou guilty, the jury was tainted, resulting in substantial prejudice to Napulou's right to a fair and impartial jury. In Napulou's view, the jurors' responses during *voir dire* suggested either "one or more jurors was lying, or at best, was knowingly concealing information about matters raised in Communication No. 2." Napulou points out that "if a juror could be dishonest about revealing his concerns raised in Communication No. 2, then that juror could be equally dishonest about remaining fair and impartial."

■■■ A fair trial by an impartial jury is guaranteed to the criminally accused by both the United States and Hawai'i Constitutions. *State v. Williamson*, 72 Haw. 97, 102, 807 P.2d 593, 596 (1991). A criminal defendant is therefore entitled to a trial by an impartial jury "free from outside influences." *State v. Keliiholokai*, 58 Haw. 356, 357, 569 P.2d 891, 893 (1977) (citation omitted). A jury's verdict must be based upon evidence received in open court and not from outside sources. *Id.* at 358, 569 P.2d at 894.

Once there is a claim that an accused is being denied his or her right to a fair trial because of outside influences infecting a jury,

the initial step for the trial court to take ... is to determine whether the nature of the [outside influence] rises to the level of being substantially prejudicial. ...

*Keliiholokai*, 58 Haw. at 359, 569 P.2d at 895 (citations omitted). Where the trial court does determine that such influence is of a nature which could substantially prejudice the defendant's right to a fair trial, a

1. Refer to *State v. Eastman*, 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996), for the definition of

substantial evidence.

rebuttable presumption of prejudice is raised. The trial judge is then duty bound to further investigate the totality of circumstances surrounding the outside influence to determine its impact on jury impartiality. The standard to be applied in overcoming such a presumption is that the outside influence on the jury must be proven harmless beyond a reasonable doubt. The trial court, in its investigation of the totality of circumstances, should include individual examination of potentially tainted jurors, outside the presence of the other jurors, to determine the influence, if any, of the extraneous matters.

*State v. Williamson,* 72 Haw. at 102, 807 P.2d at 596 (citations and quotation marks omitted).

■ In Napulou's case, the trial court implicitly recognized that the jurors' comments regarding their safety concerns and possible retaliation by Napulou's family possibly affected Napulou's substantial right to receive a fair trial by an impartial jury. The court therefore conducted a *voir dire* of each juror outside the presence of the other jurors, in accordance with *Williamson,* to determine if any jurors had actually been tainted by the jury's discussion about Napulou's family.

The trial court questioned each juror individually. The proceedings were unhurried and thorough. Napulou's defense counsel was permitted to question the jurors and did so at some length. The questioning revealed that the jurors paid little attention to members of Napulou's family. Clearly, any concerns of the jurors about Napulou's family were peripheral to the matter of Napulou's guilt or innocence and did not have a direct bearing on the evidence in the case. Neither the court nor counsel elicited any evidence during the *voir dire* to indicate that the jurors' comments regarding Napulou's family were "used as a circumstance against" Napulou or that jurors considered the comments in question during their deliberations. Furthermore, the three jurors who appeared most concerned for their safety, jurors Nos. 2, 9, and 12, were positive in their assertions that they could continue as impartial jurors,

unaffected by the safety concerns that had disturbed them.

The statements of the jurors on *voir dire,* if believed, were sufficient to establish beyond a reasonable doubt that Napulou was not denied an impartial jury. The trial court found the jurors to be credible:

Court is satisfied based upon the voir-dire that we have a fair and impartial jury, viewing their demeanor and their specific responses and comparing the same. So I'm going to deny it at this time, and you can certainly renew it if other matters come up.

We conclude that the trial court proceeded properly, and that its findings are not clearly erroneous.

Napulou's contention that at least one of the jurors must have been lying is, furthermore, based on the premise that Communication No. 2 was entirely accurate. Communication No. 2 was written by jurors Nos. 9 and 12. It appears from the record of the *voir dire* that some jurors had general questions of whether problems having to do with safety or harrassment might occur, based on things they had seen or heard on television, rather than a belief that any juror had actually been followed. On *voir dire,* no juror admitted he or she had actually been followed, nor did any juror say that any of the other jurors believed he or she had actually been followed or otherwise subjected to intentional intimidation tactics by Napulou's family. Therefore, Communication No. 2 may have been partly inaccurate.

The trial judge, as the trier of fact, was empowered to assess the credibility of the jurors. The record supports the conclusion that the jurors' concerns were in the abstract rather than the specific, and that the panel could serve as impartial jurors. The record supports the conclusion that the effect of any jurors' improper comments was harmless beyond a reasonable doubt. Therefore, we conclude that the trial court did not abuse its discretion in denying Napulou's motion for a mistrial.

### B. *Cross-Examination*

Napulou relied on an alibi defense. He testified that on the day the subject crimes were committed, he was at work. Upon examination by the State and over Napulou's objection, Napulou testified that his girlfriend, his girlfriend's parents, his mother, two sisters, and a nephew knew that he was working on the day in question. Napulou contends that by allowing this line of questioning, the court allowed the State to suggest to the jury that Napulou was required to prove his innocence, thereby impermissibly shifting the burden of proof to Napulou. We disagree.

The scope of cross-examination is generally within the sound discretion of the court. *State v. Jackson*, 81 Hawai'i 39, 47, 912 P.2d 71, 79 (1996). In general, "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." Hawai'i Rules of Evidence Rule 611(b). However, this rule does not limit cross-examination to the same acts and facts to which a witness has testified on direct examination. Rather, "[t]he proper scope of cross-examination ... includes ... full development of matters broached on direct examination, including facts reasonably related to matters touched on direct[.]" A. Bowman, *Hawaii Rules of Evidence Manual*, § 611–2B (1990).

If, as here, a defendant asserts an alibi defense, the prosecutor is not limited to a mere categorical review of the evidence testified to on direct examination. "[O]nce having taken the witness stand in his behalf, the defendant may be cross-examined on collateral matters bearing upon his credibility, the same as any other witness." *State v. Pokini*, 57 Haw. 17, 22, 548 P.2d 1397, 1400 (1976). The prosecutor's proffered questions were reasonably related to the alibi defense which Napulou asserted and to Napulou's credibility, and, therefore, the questions were within the permissible scope of cross-examination. The trial court did not abuse its discretion.

### C. *Prosecutorial Misconduct*

In closing argument, the prosecutor referred to Napulou's failure to produce witnesses corroborating his alibi defense that he was working on the day of the offense.

[PROSECUTOR]:....

\* \* \*

[H]e [Napulou] wants you to believe that it's a mere coincidence that he is the man. So what does he do? He tries to claim that he was at work. Alibi.

The Judge will instruct you that they don't have any burden to prove anything. We have to disapprove [sic] their case, but when they put on evidence, you treat their witnesses and their evidence the same as anybody else, you don't just automatically accept it, and when we go through their testimony, it shows that the alibi defense really is not available.

\* \* \*

There were no records to show that [Napulou] was indeed working that day. He told you that his family knew he was working. We had no evidence that anyone came forward, said, hey, [Napulou] was at work that day.

[DEFENSE COUNSEL]: I have to object as being improper argument, Your Honor.

THE COURT: Approach.

[DEFENSE COUNSEL]: Your Honor, he's aware that we have no duty to call witnesses to comment upon the fact that no relatives have come to court to testify. That's improper.

THE COURT: He can't comment on absence of evidence. That's your—

[DEFENSE COUNSEL]: Well, just to suggest that they knew something that they were not divulging, I think is improper.

[PROSECUTION]: Your Honor, there is an instruction about that, counsel can point to, however, it's fair inference and fair comment about any lack of evidence.

THE COURT: If there's nothing further, the objection is overruled.

The trial court instructed the jury as follows:

THE COURT:....

* * *

The defendant in this case has introduced evidence tending to show that he was not present at the time and place of the commission of these alleged offenses to which he is here on trial. This does not mean that the defendant has any burden. The State has the burden of proving beyond a reasonable doubt that the person who committed these alleged offenses was Craig Napulou.

■ In reviewing allegations of prosecutorial misconduct, the test for reversal is whether the prosecutor's actions so prejudiced the defendant as to deny him a fair trial. *State v. Ganal*, 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996). We decide that the prosecutor's comments did not constitute misconduct and did not deny Napulou a fair trial.

■ Napulou argues that remarks by the prosecutor during closing argument about Napulou's failure to present witnesses to testify in support of his alibi defense were improper and deprived him of a fair trial because they implied that he had the burden of proving his innocence. We disagree for two reasons.

First, none of the prosecutor's remarks suggested that Napulou had a burden of proof which he failed to carry. *United States v. Dahdah*, 864 F.2d 55, 59 (7th Cir.) ("[C]ommenting on a defendant's failure to call a witness does not have the effect of shifting the burden of proof unless it taxes the exercise of the defendant's right not to testify, a claim Dahdah does not make here."), *cert. denied*, 489 U.S. 1087, 109 S.Ct. 1550, 103 L.Ed.2d 853 (1989); *United States v. Schultz*, 698 F.2d 365, 367 (8th Cir.1983) (prosecutorial comment on defendant's failure to call an available alibi witness does not impermissibly shift the burden of proof to defendant); *State v. Macon*, 845 S.W.2d 695, 696 (Mo.Ct.App.1993) (prosecutor's comments concerning defendant's lack of corroborating evidence does not constitute an improper shift of the burden of proof in light of the court's instructions on the state's burden); *see also, United States v. Bautista*, 23 F.3d 726, 733 (2d Cir.) ("the government may comment on a defendant's failure to call witnesses to support his factual theories," but may not "suggest that the defendant has the burden of producing evidence"), *cert. denied*, 513 U.S. 862, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994); *United States v. Rosa*, 11 F.3d 315, 342 (2d Cir.) (where prosecutor commented in rebuttal argument on defendant's failure to call a witness, but was careful not to suggest that defendant had any burden of proof or any obligation to produce any evidence, the comments were not improper), *cert. denied*, 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1993); *United States v. Clark*, 982 F.2d 965, 968 (6th Cir.1993) (prosecution can comment on defendant's failure to call witnesses, but must avoid commenting in such a way that he treads on defendant's constitutional rights and privileges).

The court's jury instructions confirmed that the State had the entire burden of establishing Napulou's guilt. Indeed, in the course of observing the paucity of evidence exculpating Napulou, the prosecutor candidly acknowledged that "they [Napulou and his counsel] don't have any burden to prove anything."

■ Second, "a prosecutor, during closing argument, is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence." *State v. Clark*, 83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996). Thus,

[t]he prosecution is entitled to call attention to the fact that the testimony of the witnesses for the prosecution has not been controverted, unless the circumstance that the defendant is the only one who could possibly contradict that testimony would necessarily direct the jury's attention solely to the defendant's failure to testify.

*State v. Padilla*, 57 Haw. 150, 158, 552 P.2d 357, 362–63 (1976). In *Padilla*, the defendant did not testify. During closing arguments, the prosecutor made the following remarks, which are similar to those Napulou is objecting to in the case at bar: "The defendant doesn't have to prove anything.

But in view of the fact that prosecution has proved way beyond a reasonable doubt, what are we to conclude? Nothing, except that he's guilty. Where are the defendant's friends?" *Id.* at 158, 552 P.2d at 362.

In other jurisdictions, courts have clearly held that a prosecutor may comment on the credibility of defense witnesses and the lack of evidence corroborating a defendant's alibi. *United States v. Santana,* 877 F.2d 709, 711 (8th Cir.1989) ("The prosecutor is free to comment on the failure of the defendant to call an available alibi witness." (quoting *United States v. Schultz,* 698 F.2d 365, 367 (8th Cir.1983))); *State v. Sanchez,* 120 N.M. 247, 254, 901 P.2d 178, 185 (1995) (citing *People v. Medina,* 190 Colo. 225, 545 P.2d 702 (1976)); *Jackson v. State,* 763 P.2d 388, 389 (Okla. Crim.App.1988) ("failure to put on the stand a material witness who could bolster a defendant's alibi defense is [a] legitimate matter for prosecutorial comment during closing argument").

Whether or not the defendant testifies, the prosecutor may make comments on the state of the evidence or the failure of the defense to introduce material evidence or to call logical witnesses. *People v. Jackson,* 28 Cal.3d 264, 304, 168 Cal.Rptr. 603, 623, 618 P.2d 149, 169 (1980), *cert. denied,* 450 U.S. 1035, 101 S.Ct. 1750, 68 L.Ed.2d 232 (1981). *And see, United States v. Yuzary,* 55 F.3d 47, 53 (2d Cir.1995) ("the prosecutor was entitled to comment on [defendant's] failure to support his own factual theories with witnesses"); *Nichols v. Scott,* 69 F.3d 1255, 1282–83 (5th Cir.1995) (a prosecutor may properly comment on the weight of the evidence); *United States v. Dula,* 989 F.2d 772, 777 (5th Cir.) ("It is not error to comment on the defendant's failure to produce evidence on a phase of the defense upon which he seeks to rely."), *cert. denied,* 510 U.S. 859, 114 S.Ct. 172, 126 L.Ed.2d 131 (1993); *United States v. Lopez,* 803 F.2d 969, 973 (9th Cir.) ("A prosecutor may call attention to the defendant's failure to present exculpatory evidence if those comments do not call attention to the defendant's failure to testify[.]"), *cert. denied,* 481 U.S. 1030, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1986); *People v. Mincey,* 2 Cal.4th 408, 446, 6 Cal. Rptr.2d 822, 845, 827 P.2d 388, 411, *cert. denied,* 506 U.S. 1014, 113 S.Ct. 637, 121 L.Ed.2d 567 (1992); *State v. Hodges,* 105 Idaho 588, 591, 671 P.2d 1051, 1054 (1983) (Where the prosecutor commented that a state witness' testimony was uncontradicted, the court held it was not "an impermissible reference to the defendant's failure to testify. Rather it is a comment on the weight of the evidence produced[.]"); *State v. Dolan,* 190 Mont. 195, 205–06, 620 P.2d 355, 360–61 (1980) (Where the defendant did not testify and the prosecutor commented on the defendant's failure to present logical witnesses, the court stated, "Certainly the prosecution, as an adversary for the state, cannot be prohibited from arguing the strength of its case to the jury."); *Fortner v. State,* 843 P.2d 1139, 1146 (Wyo.1992) (citing *Boyd v. State,* 528 P.2d 287, 292 (Wyo.1974), *cert. denied,* 423 U.S. 871, 96 S.Ct. 137, 46 L.Ed.2d 102 (1975)); *Mitchell v. State,* 884 P.2d 1186, 1201–02 (Okla.Crim.App.1994) (a prosecutor may comment on a defendant's failure to either call a material witness or account for his absence, as long as the prosecutor does not draw conclusions for the jury), *cert. denied,* —— U.S. ——, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995).

We agree with the majority [2] of the courts that have addressed this issue and hold that no error occurred. Here, Napulou relied on an alibi defense and presented some evidence concerning alibi, opening the door to the prosecution's comment. The prosecutor's remarks constitute comment on the state of the evidence, Napulou's failure to call logical witnesses, and/or to present material evidence, and were not improper, nor did they shift the burden of proof to Napulou.

---

**2.** The Nevada Supreme Court held, however, that

> [i]t is generally also outside the boundaries of proper argument to comment on a defendant's failure to call a witness. This can be viewed as impermissibly shifting the burden of proof to the defense. Such shifting is improper be-

cause "[i]t suggests to the jury that it was the defendant's burden to produce proof by explaining the absence of witnesses or evidence. This implication is clearly inaccurate."

*Ross v. State,* 106 Nev. 924, 927, 803 P.2d 1104, 1105–06 (Nev.1990) (citations omitted).

## CONCLUSION

Accordingly, we affirm the November 22, 1993, Judgment convicting defendant Craig Napulou of Attempted Murder in the Second Degree, HRS §§ 705–500 and 707–701.5(1) (1993), Burglary in the First Degree, HRS § 708–810(1)(c) (1993), and Assault in the Second Degree, HRS § 707–711(1)(d) (1993).