81 P.3d 1200

**STATE of Hawai'i, Plaintiff–Appellee**

v.

**Edwin KIM, also known as Edwin Alexander Kim, Defendant– Appellant.**

**No. 24216.**

Supreme Court of Hawai'i.

Dec. 30, 2003.

Keith Shigetomi, Honolulu, on the briefs, for defendant-appellant.

Mangmang Qiu Brown, on the briefs, Deputy Prosecuting Attorney, for plaintiff-appellee.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ., Circuit Judge McKENNA, assigned by reason of vacancy, and ACOBA, J. dissenting.

Opinion of the Court by NAKAYAMA, J.

Defendant-appellant Edwin Kim appeals from the judgment of the circuit court of the first circuit, the Honorable Sandra A. Simms presiding, convicting Kim of and sentencing him for (1) murder in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 707–701.5 (1993)[1] (Count I), (2) place to keep a pistol or revolver, in violation of HRS § 134–6(c) and (e) (1993)[2] (Count II), and (3)

---

1. HRS § 707–701.5 provides in relevant part that, "[e]xcept as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

2. HRS § 134–6(c) and (e) provides in relevant part:

(c) Except as provided in sections 134–5 and 134–9, all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following: a place of repair; a target

ownership or possession prohibited of any firearm or ammunition by a person convicted of certain crimes, in violation of HRS § 134–7(b) and (h) (1993)[3] (Count III). On appeal, Kim argues that the circuit court erred by denying his motion for judgment of acquittal and/or new trial. As discussed *infra*, in section III, the circuit court did not abuse its discretion by denying Kim's motion for judgment of acquittal and/or new trial. Accordingly, we affirm the circuit court's March 19, 2001 judgment.

## I. BACKGROUND

Following an alleged gang shooting that killed Gercel Ong, Kim was arrested and charged with Counts I, II, and III. During Kim's trial, Curtis Kubo (Kubo), a criminalist with the Honolulu Police Department, testified regarding the bullet recovered from the scene:

[Prosecutor:] Mr. Kubo, I'm going to show you State's exhibit 28 and ask you if you recognize that.

[Kubo:] Yes, I do.

[Prosecutor:] What is it?

[Kubo:] It's a bullet that I examined under Police Report No. 99–406926.

[Prosecutor:] Was that recovered by John Wadahara[4] on November 20th, 1999, from a Toyota Tercel.

[Kubo:] Yes.

[Prosecutor:] Did you analyse [sic] that, I guess, under a microscope? Is that what you did?

[Kubo:] Yes, I did.

[Prosecutor:] And what are you looking for when you do that?

[Kubo:] Well, I was just trying to identify the bullet as far as caliber, barrel impressions and other characteristics of the bullet.

[Prosecutor:] Okay. And could you tell what type of gun that bullet came from?

[Kubo:] Well, what I found was that bullet was consistent with being in a caliber .38 class, which includes the .38 Special and the .357 Magnum.

[Prosecutor:] I'm sorry. Let me just stop you there, first, and ask you what's the difference between a .38 Special—or a .38 and a .357 Magnum?

[Kubo:] Well, this—a class is called a .38—caliber .38 which consists of different calibers, specific calibers. And that include [sic] the .38 Special and a .357 Magnum. Both of those calibers use the same bullet; they just have a different case length.

[Prosecutor:] And what does that mean?

[Kubo:] Well, the bullets can interchange between the two calibers.

[Prosecutor:] Okay. And so if you have a .357 Magnum, you can fire either type of bullets? Is that what you're saying?

[Kubo:] In a .357, you can fire a .357 Magnum or .38 Special, but you can't go the other way. You can't fire a .357 Magnum in a .38 Special firearm.

. . . .

---

range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal hunter or firearm use training or instruction; or a police station. "Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

. . . .

(e) Any person violating subsection (a) or (b) shall be guilty of a class A felony. Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony. Any person violating this section by carrying or possessing an unloaded firearm, other than a pistol or revolver, shall be guilty of a class C felony.

3. HRS § 134–7(b) and (h) provides in relevant part:

(b) No person who is under indictment for, or has waived indictment for, or has been bound over to the circuit court for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition therefor.

. . . .

(h) Any person violating subsection (a) or (b) shall be guilty of a class C felony; provided that any felon violating subsection (b) shall be guilty of a class B felony. . . .

4. John Wadahara was an evidence specialist for the Honolulu Police Department.

[Prosecutor:] Okay. Does that differ between a .38 and a .357?

[Kubo:] Like I said, in the .357 Magnum, the case would be longer than a .38 Special.

[Prosecutor:] And what does a longer casing do for the bullet?

[Kubo:] You would have more space for gunpowder which results in more velocity.

[Prosecutor:] More velocity?

[Kubo:] Yes.

[Prosecutor:] And power?

[Kubo:] Yes.

[Prosecutor:] So you couldn't tell whether it was a .38 or .357 from just the bullet itself, basically; right?

[Kubo:] Yes.

. . . .

[Prosecutor:] What else—what type of bullet was that besides what type of gun it came from? Are there different types of bullets?

[Kubo:] Yes.

[Prosecutor:] What type was this from?

[Kubo:] This one could be either a jacketed hollow point or jacketed soft point bullet hollow.

[Prosecutor:] What does it mean, and what's the significance of that type of bullet?

[Kubo:] This type of bullet would be designed to expand when it hits something soft, like tissue. That hollow point or the soft point would expand or mushroom out so that you would have ended up with a larger caliber projectile.

[Prosecutor:] And I guess in plain English, does that mean it would do more damage, when it mushrooms out—

[Kubo:] Yes.

[Prosecutor:]—as it passes through the tissue?

[Kubo:] Potentially, yes.

[Prosecutor:] Now, from looking at that bullet in this case, can you tell if it came from a revolver or not?

[Kubo:] There's indications where what's called slippage or skid marks, and that occurs mainly in revolvers. In revolvers, the bullet has to pass through a space from the chamber into the barrel before it engages the rifling. And because it has this little space, it kind of slips, initially, before it engages the rifling. And that's what I saw in the bullet.

[Prosecutor:] And what would that tend to—what conclusion did you reach based on that slippage that you saw?

[Kubo:] That those marks are consistent with it being fired from the revolver.

[Prosecutor:] Now, in a handgun, handguns have various sizes of barrels; right?

[Kubo:] Yes.

[Prosecutor:] And the barrel is the part that the bullet passes through; right?

[Kubo:] Yes.

[Prosecutor:] What is the—what is the purpose, or what happens as you get a longer barrel in a handgun?

[Kubo:] Well, a couple things. The longer the barrel length, the more velocity you'll get up to a certain point. The other thing is that all other things being equal, it would be easier to hit your target with a longer barrel length.

Well, if you can imagine, on a short barrel, the distance between the rear sight and the front sight would be short. And when you go to a longer barrel length, it lengthens. So that any deviation from when you—when you're aiming at something will be magnified more at a shorter barrel length.

[Prosecutor:] So more accurate is the longer barrel length. There's a converse to that right?

[Kubo:] Like I said, all other things being equal, too. It depends on who's shooting the gun and other things, also.

In addition, the chief medical examiner for the City and County of Honolulu, Alvin Omori, testified as follows:

[Prosecutor:] Dr. Omori, I'd like to direct your attention to November 22nd, 1999.

Did you perform an autopsy on a person identified as Gercel Ong?

[Omori:] Yes, I did.

[Prosecutor:] And to a reasonable degree of medical certainty, what is your opinion as to the cause of Mr. Ong's death?

[Omori:] Mr. Ong died as a result of what we call a perforating or a through-and-through gunshot wound through his chest. The entrance wound was over his left upper back. The bullet exited the front portion of his chest, just adjacent to the left nipple. And he had injuries to his left lung.

. . . .

[Prosecutor:] Doctor, if I could ask you to step down. And perhaps using these diagrams, explain to the jury what your findings were.

. . . .

[Omori]: 26. Basically we just have an outline of an individual. Mr. Ong had a single gunshot wound, and the entrance point was to his left upper back. . . . As the bullet traveled through the body, on State's Exhibit No. 27, it actually fractured the rib. This is what we call the sixth rib. It fractured the back portion of the sixth rib, went through the lung, which is this structure that is enclosed by the ribs, and it came out through the left fifth rib.

At the end of the trial, the court instructed the jury that Count I required a finding of "intentionally or knowingly" causing the death of another person. The court then instructed the jury that if it found Kim not guilty of Count I, it had to consider whether he committed the offense of manslaughter by "recklessly" causing the death of another person. The court also instructed the jury as follows:

[Reasonable doubt] is a doubt in your mind about the defendant's guilt which arises from the evidence presented or from the lack of evidence and which is based upon reason and common sense. Each of you must decide, individually, whether there is or is not such a doubt in your mind after careful and impartial consideration of the evidence.

. . . .

You must consider only the evidence which has been presented to you in this case and such inferences therefrom as may be justified by reason and common sense.

. . . .

During the course of the trial, you have received all of the evidence you may consider to decide the case. You must not attempt to gather any information on your own which you think might be helpful. Do not engage in any outside reading on any matter having anything to do with this case. Do not refer to dictionaries or other outside sources. Do not visit any places mentioned in the case. Do not in any other way try to learn about the case outside the courtroom.

On October 11, 2000, the jury found Kim guilty on all three counts. On October 19, 2000, Kim filed a motion for judgment of acquittal and/or new trial.

During the hearing on Kim's motion for judgment of acquittal and/or new trial, Kim's attorney stated that Juror Seven, called him the day after the verdict and discussed the jury deliberations. As an offer of proof as to what Juror Seven would testify to, Kim's attorney stated,

They began deliberations by examining various photographs and physical evidence without discussing those matters, which included the photographs presented by the State and I believe the cartridges recovered by the State. Then there was an initial polling—not polling—a voting, I guess, as to a verdict, and the—when they counted the voting, it turned out that it was 11 voting guilty for Murder and one voting for Manslaughter. And [Juror Seven] would testify that she was the person who cast her vote for the Manslaughter.

Then it was suggested by [Juror Nine], that they should at least discuss the evidence that was presented in court as well to discuss the Court's instructions to them. So it was determined that in an effort to do that, that each juror would read a particular instruction. And that went on until they reached [Juror Ten], who responded, What the fuck are we doing this for? I want to know who voted for the Manslaughter. And at that point he said that in a very angry and intimidating manner, which caused everything to stop. Then

again, he said, I don't know why we're doing this. I want to know who the fuck said Manslaughter. At that point ... the foreperson, asked [Juror Nine] if it was her who was the one who voted for Manslaughter. And [Juror Nine] responded by saying, no, it was not her. At that point, [Juror Seven], due to the manner in which things were proceeding in a very heated way said, It was me. I am the one who said Manslaughter.

' There again was this—a request that we should at least discuss the evidence that was presented as well as the Court's instructions before we come back with a verdict, so at least we could feel that, you know, we talked about this case. At that point, [Juror Ten] again in a very forceful manner started talking about how he on a weekly basis went to the shooting range and fired firearms. And in a very heated manner again, saying, Do you know the type of damage that a magnum can do? That that can do so much damage, that is a deadly weapon, and if anyone uses a magnum, they had to have a deadly intent. [The foreperson] also discussed his experience with firearms, and again supporting [Juror Ten's] assertions that it was a very dangerous weapon and that again relying on his personal experience, that it had to have been an intentional shooting.

*Because of the manner that [Juror Seven] would characterize as brow-beating and angry, she responded by saying, okay, I'll just go along with everyone else.* And at that point—I guess at some point around that time, they notified the Court that they had reached a unanimous decision.

Upon being called into court, the Court did poll the jury, and [Juror Seven] would say that she told the Court that she agreed with the verdict because, in her mind, she believed that if she spoke up at that point, she would just be sent back to the deliberation room with again these 11 people, who were strongly disagreeing with her, and she didn't feel that that would be of any benefit.

(Emphasis added.) At the end of the hearing, the court orally denied Kim's motion for judgment of acquittal and/or new trial ruling that the offer of proof "[was] not sufficient to warrant there being evidence produced on that issue."

On March 19, 2001, the circuit court entered its judgment of guilty conviction. Kim was sentenced to life imprisonment with a mandatory minimum term of fifteen years for Count I, ten years' imprisonment for Count II, and five years' imprisonment for Count III. On April 17, 2001, Kim filed a timely appeal.

## II. STANDARD OF REVIEW

■■■■ As a general matter, the granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. The same principle is applied in the context of a motion for new trial premised on juror misconduct. The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.

*State v. Furutani,* 76 Hawai'i 172, 178–79, 873 P.2d 51, 57–58 (1994) (citations and quotations omitted).

## III. DISCUSSION

On appeal, Kim argues that he did not have a fair trial due to juror misconduct because "jurors disregarded the trial court's instruction regarding not referring to information from outside sources" and jurors intimidated and harassed Juror Seven. Because Kim failed to satisfy his burden of establishing a prima facie showing that the possibility of juror misconduct could have substantially prejudiced his right to a fair trial by an impartial jury, the circuit court did not abuse its discretion by denying Kim an evidentiary hearing on his motion for a new trial.

■■■■ The sixth amendment to the United States Constitution [5] and article I, section 14

5. The sixth amendment to the United States Con-

stitution provides in relevant part that "[i]n all

of the Hawai'i Constitution [6] guarantee the criminally accused a fair trial by an impartial jury. *State v. Gabalis*, 83 Hawai'i 40, 45, 924 P.2d 534, 539 (1996) (citation omitted). If any juror was not impartial, a new trial must be granted. *Id.* However, "not all juror misconduct necessarily dictates the granting of a new trial. A new trial will not be granted if it can be shown that the jury could not have been influenced by the alleged misconduct." *Furutani*, 76 Hawai'i at 180, 873 P.2d at 59.

▪ When a defendant claims a deprivation of a right to a fair trial by an impartial jury, he or she "bears the initial burden of making a prima facie showing of a deprivation that could substantially prejudice his or her right to a fair trial by an impartial jury." *Id.* at 181, 873 P.2d at 60 (internal quotations and brackets omitted).

[I]n order for a criminal defendant to make a prima facie showing that a juror's comment(s) during the jury's deliberations deprived him or her of the right to a fair trial by an impartial jury, the defendant must,

by an *objective* evaluation of the comment ... show that: (1) the comment was improper; and (2) the comment was used as a circumstance against the defendant.

*Gabalis*, 83 Hawai'i at 46, 924 P.2d at 540. "Whether it does rise to that level is ordinarily left to the discretion of the trial court." *State v. Adams*, 10 Haw.App. 593, 599, 880 P.2d 226, 232 (1994) (citation omitted).

▪ The defendant's burden to show prejudice arising from juror misconduct during deliberations is difficult because, pursuant to Hawai'i Rules of Evidence (HRE) Rule 606(b),[7] the court "cannot consider the jurors' testimony as to the effect of the improper statement upon them." *State v. Larue*, 68 Haw. 575, 579, 722 P.2d 1039, 1043 (1986). The court "can only consider whether such a statement was made (which is undisputed), and whether, given that statement, we can say that appellant had a trial before an impartial jury." *Id.*

▪ Once the trial court determines that a juror's comments could substantially preju-

---

criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed...."

6. Article I, section 14 of the Hawai'i Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the district wherein the crime shall have been committed...."

7. HRE Rule 606(b) provides:
Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify concerning the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. Nor may the juror's affidavit or evidence of any statement by the juror indicating an effect of this kind be received.
The commentary to HRE Rule 606 explains the origins and purpose of the rule:
Subsection (b): Under traditional English common law, the general competency of a juror to testify as a witness had one limitation: he was barred from giving testimony to impeach his own verdict. See McCormick § 68; *Vaise v. Delaval*, 1 T.R. 11, 99 Eng. Rep. 944 (K.B.1785). "The values sought to be promoted," according to the Advisory Committee's Note to the original proposal for federal Rule

606(b), "included freedom of deliberation, stability and finality of verdicts, and protection of jurors against annoyance and embarrassment." However, the blanket prohibition also bars testimony relevant to misconduct, irregularities, and improper influences external to the process of deliberation. The intent of this subsection is to strike a proper balance by excluding testimony relating to the internal deliberative process and allowing testimony about objective misconduct and irregularities. No attempt is made to specify substantive grounds for setting aside verdicts.
The Advisory Committee's Note to the original federal proposal, upon which subsection (b) is modeled, said: "The trend has been to draw the dividing line between testimony as to mental processes, on the one hand, and as to the existence of conditions or occurrences of events calculated improperly to influence the verdict, on the other hand, without regard to whether the happening is within or without the jury room.... The jurors are the persons who know what really happened. Allowing them to testify as to matters other than their own reactions involves no particular hazard to the values sought to be protected. The rule is based upon this conclusion." For example, under this rule jurors would be competent to testify to the consumption of alcoholic beverages by deliberating jurors, a matter which under some circumstances may be cause for setting aside a verdict, see *Kealoha v. Tanaka*, 45 H[aw]. 457, 370 P.3d 468 (1962).

dice the defendant's right to a fair trial by an impartial jury, a rebuttable presumption is raised and "the trial judge is then duty bound to further investigate the totality of circumstances surrounding the alleged deprivation to determine its impact on jury impartiality." *Furutani,* 76 Hawai'i at 181, 873 P.2d at 60 (citation and brackets omitted). The burden then falls on the prosecution to show that the alleged deprivation was harmless beyond a reasonable doubt. *Id.*

■ In the instant case, Kim failed to satisfy his initial burden of establishing a prima facie showing that the possibility of juror misconduct could have substantially prejudiced his right to a fair trial. Kim asserted that Juror Seven would testify that Juror Ten, said, "What the fuck are we doing this for? I want to know who voted for the Manslaughter. I want to know who the fuck said Manslaughter." Juror Seven would also testify that Juror Ten, drawing on his personal experience with firearms, said, "Do you know the type of damage that a magnum can do? That that can do so much damage, that is a deadly weapon, and if anyone uses a magnum, they had to have a deadly intent," and that the foreperson supported Juror Ten. Juror Seven subsequently decided to "just go along with everyone else."

The above statements, if we accept that they were made, do not constitute information from outside sources, and, thus, were not improper. During his testimony, Kubo testified that a .357 magnum weapon has a longer case, resulting in the bullet having more velocity and power. Moreover, the bullets used were either jacketed hollowed point or jacketed soft point, both of which are designed to expand or mushroom out when hitting tissue. In addition, Dr. Omori testified that the victim died of a bullet that entered his back, fractured his rib, punctured his lung, and exited his chest. Based on the foregoing, Juror Ten's statement that a magnum can do "much damage" was established by Kubo and Dr. Omori during trial, and,

thus, was neither information from outside sources nor improper.

Even if Juror Ten's statements were considered outside information, it is not the kind that would warrant a new trial. In *Gabalis,* this court held that a juror's comments regarding her impression of a particular establishment were not improper. *Gabalis,* 83 Hawai'i at 46, 924 P.2d at 541. This court noted that "[i]t is perhaps inevitable that, during jury deliberations, jurors may verbalize, based on their background and experiences, their perceptions regarding certain establishments or locations mentioned at trial." *Id.* In the instant case, Juror Ten verbalized that magnums can cause damage when used against a person. In fact, it is common knowledge that guns, in general, can cause damage when used against a person. Like the juror's statements in *Gabalis,* Juror Ten's statements were "insufficiently prejudicial to warrant the grant of a new trial." *Id.*

■ Assuming, *arguendo,* that Juror Ten's statements were improper, Kim would still be required to show how these statements were used as a circumstance against him. Pursuant to HRE Rule 606(b), Juror Seven would not be allowed to testify as to the effect Juror Ten's statements had upon her. As such, this court may not consider Juror Seven's belief that Juror Ten's statements influenced her decision.[8] Because Kim's offer of proof made no other showing as to how Juror Ten's statements were used as a circumstance against him, his offer of proof was insufficient to warrant an evidentiary hearing. As such, based on the facts and circumstances in the instant case, we hold that the circuit court did not abuse its discretion by denying Kim an evidentiary hearing on his motion for a new trial based on juror misconduct.

■ Also of much importance, public policy demands that the sanctity of jury deliberations be vigorously guarded to ensure frankness and open discussion. It would be fatuous to expect or necessitate that all jurors be placid and composed during jury

---

8. We do not hold that "jurors may not testify about incidents of jury misconduct during deliberations." Dissent at 289, 81 P.3d at 1204. We, instead, hold that jurors may not testify as to the *effect* an improper statement has on their decision, which is what Kim's offer of proof attempted to establish was a circumstance that was used against him.

deliberations. Jury verdicts are reached only after open discussion, some of which may be assertive, contentious, and even offensive.

■ In 1915, the United States Supreme Court, albeit in a civil case, described the rationale supporting prohibition against a juror testifying as to the internal deliberations of the jury:

> But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

*McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). "The law is settled that, following dispersal of a jury, once it has been dismissed, if we allow such attacks by individual members on the composite verdict of all twelve we can expect an unsettling of the system out of all proportion to any expectable improvement in the administration of justice." *United States v. Barber,* 668 F.2d 778, 786 (4th Cir.1982), *disapproved for other reasons by United States v. Price,* 857 F.2d 234, 235 (4th Cir.1988).[9] Al-

lowing inquiry into the effect of internal matters of jury deliberation upon the mental processes of particular deliberating jurors would discourage open discussion among jurors and severely impact the finality of judgments. Thus, public policy supports our holding in the instant case.

The dissent's proposed holding would likely inundate the circuit courts with new trials anytime a juror exhibits regret over a verdict. The dissent claims that: (1) Juror Ten's statements were improper because the statements intimidated Juror Seven and constituted extraneous information; (2) Juror Ten's statements were a circumstance against Kim because "[j]uror conduct that taints the integrity of the verdict manifestly redounds to the Defendant's detriment[;]" (3) Juror Ten and the foreperson made untruthful statements during voir dire; and (4) intimidation by fellow jurors "infringes upon a juror's right to serve." As discussed *supra,* regarding issues 1 and 2, the facts and circumstances in the instant case show that the circuit court did not abuse its discretion by denying Kim's motion for a new trial because Kim failed to meet his burden of making a prima facie showing in his offer of proof that Juror Ten's statements were improper, and, even if the statements were improper, Kim failed to show in his offer of proof that the statements were used as a circumstance against him. Regarding issues 3 and 4, these issues were neither raised nor argued by Kim on appeal, and, thus, will not be addressed by this court. *See* Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4) ("Points not presented in accordance with this section will be disregarded except that the appellate court, at its option, may notice

9. In *Barber,* the United States Court of Appeals for the Fourth Circuit based its decision pertaining to post-verdict juror interviews on the Federal Rules of Evidence (FRE) Rule 606(b). FRE Rule 606(b) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether

extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Despite the dissent's claim that this court "in effect imports the greater restrictive scope of Federal Rule 606(b) into HRE Rule 606(b)," FRE Rule 606(b) was merely provided as a convenience to the reader in understanding *Barber.* At no time does this court base its opinion on FRE Rule 606(b). Dissent at 293, 81 P.3d at 1208.

a plain error not presented."); HRAP Rule 28(b)(7) ("Points not argued may be deemed waived.").

## IV. CONCLUSION

Based on the foregoing, we affirm the circuit court's March 19, 2001 judgment.

Dissenting Opinion by ACOBA, J.

I must strongly disagree with the majority. Intimidation or overbearing conduct of one juror by and towards another is unacceptable in our courts. We should not countenance coercive conduct in jury deliberations. To permit such conduct is to set a legal threshold so low as to be destructive of the deliberative process insured by our constitutions and of the role of those who are called to jury service. Because of this and other juror misconduct, I disagree with affirmance and would remand for an evidentiary hearing.

In this case, there was an objective and *prima facie* showing by the defense that mandates an evidentiary hearing as to whether there was a reasonable *possibility* that such conduct prejudiced the right to a fair trial of Defendant–Appellant Edwin Kim (Defendant). *See State v. Augustin*, 89 Hawai'i 215, 219, 971 P.2d 304, 308 (App.1998) ("A fair trial by an impartial jury is guaranteed to the criminally accused by both the sixth amendment to the United States Constitution and article I, § 14 of the Hawai'i Constitution, as well as by principles of due process under both the state and federal constitutions." (Quoting *State v. Furutani*, 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994). (Quotation marks, brackets, and citations omitted.))).

I believe substantial prejudice resulted from (1) the intimidation of one juror by another, or (2) the introduction of extraneous information as a basis to prove an element of the offense charged. Such occurrences substantially prejudiced Defendant's right to a fair trial.

### I.

First, it is fundamental in our jurisprudence that a defendant's right to a fair trial entitles the defendant to the considered judgment of each juror as to the evidence in a case. The defendant is also guaranteed a juror's independent judgment as to the appropriate vote to cast. Such judgment cannot properly be exercised if this court permits the intimidation of one juror by another.

Accepting Defendant's offer of proof as true, the conduct of Juror Ten during jury deliberations was improper. Juror Ten cursed repeatedly in "a very angry and intimidating manner, which caused everything to stop." He attempted to impede examination of the jury instructions and commented, "What the f[*]ck are we doing this for?" Plainly, such comments were calculated to terminate deliberations.

Juror Ten's remarks also indicate a design to coerce into submission Juror Seven, who had voted contrary to his position, or any juror who might be considering a position opposing his own. He stated, "I want to know who voted for the Manslaughter" and "I don't know why we're doing this. I want to know who the f[*]ck said Manslaughter[.]" During deliberations, no juror is required to disclose his or her vote to the others as demanded by Juror Ten. His statement, then, on its face, suggests an intent to bully and to frighten Juror Seven into changing her vote. Such juror misconduct taints the deliberation process and is sufficient to justify an evidentiary hearing without regard to any alleged effect on Juror Seven.

The Colorado courts, which are subject to Rule 606(b) of the Colorado Rules of Evidence,[1] a rule materially similar to FRE Rule

---

1. Rule 606(b) of the Colorado Rules of Evidence states:

**Inquiry Into Validity of Verdict or Indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which

606(b),[2] faced a similar situation and recognized an additional exception for jury misconduct. *See People v. Rudnick*, 878 P.2d 16, 21 (Colo.Ct.App.1993). In *Rudnick*, the defendant filed a post-trial motion for a new trial when one of the jurors alleged that she "had been coerced into voting for a guilty verdict by the abusive language, threatening gestures, and psychological pressures exerted by another juror." *Id.* at 21. Consequently, the trial court conducted a hearing on the matter. *Id.* The reviewing court noted, "*If the alleged misconduct involves threats or coercion by fellow jurors, the trial court should conduct a hearing* to determine whether there is a reasonable possibility that the misconduct affected the verdict to the defendant's detriment." *Id.* (citing *Wiser v. People*, 732 P.2d 1139 (Colo.1987); *People v. Black*, 725 P.2d 8 (Colo.Ct.App.1986)) (emphasis added).[3]

A jury misconduct exception as in Colorado does not have to be read into the Hawai'i rules in order to conclude that an evidentiary hearing on the alleged misconduct is proper in this instance. In contrast to the federal rules, Hawai'i Rules of Evidence (HRE) Rule 606(b)[4] permits a juror to testify on a broader range of matters. HRE Rule 606(b) prohibits juror testimony on "*the effect* of anything," including the effect of matters and statements during deliberation. It does not prohibit, however, testimony on the matters and statements, *themselves.* HRE Rule 606(b) almost verbatim tracks FRE Rule 606(b), but the Hawai'i rule does not contain the restriction, "may not testify as to any matter or statement occurring during the course of the jury's deliberations" and the related exception allowing juror testimony as to "whether extraneous prejudicial information was improperly brought to the jury's attention." FRE Rule 606(b). Rather, HRE Rule 606(b) *allows* juror testimony about objective misconduct and irregularities.

Indeed, the commentary to HRE Rule 606(b) confirms the admissibility of such testimony and underscores the majority's erroneous application of that rule. The commentary explains that

[t]he intent of the subsection [b] is to strike a proper balance by excluding testimony relating to the internal deliberative process and *allowing testimony about objective misconduct and irregularities.* No attempt is made to specify substantive grounds for setting aside verdicts.

The Advisory Committee's Note to the original federal proposal, upon which subsection (b) is modeled, said: "The trend has been to draw the dividing line between testimony as to mental processes, on the one hand, and as to the existence of conditions or occurrences of events calculated improperly to influence the verdict, on the

---

he would be precluded from testifying be received for these purposes.

**2.** FRE Rule 606(b) states as follows:

Upon an inquiry into the validity of a verdict or indictment, a juror *may not testify as to any matter or statement occurring during the course of the jury's deliberations* or to the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith *except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.* Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.
(Emphases added.)

**3.** At the hearing, the juror alleged that during deliberations, another juror "would lean forward with his hands on the table, red-faced with angry veins popping out of his forehead. . . . [H]e accused her of not having the 'stomach for first degree' and called her a 'girl' and 'weak.' " *Rudnick*, 878 P.2d at 21 (internal quotation marks omitted). Although the alleged conduct is not as egregious as in the case before us, the Colorado courts have found that allegations of such conduct warrants an evidentiary hearing.

**4.** HRE Rule 606(b) states as follows:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify concerning *the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.* Nor may the juror's affidavit or evidence of any statement by the juror indicating *an effect of this kind* be received.
(Emphases added.)

other hand, without regard to whether the happening is within or without the jury room.... The jurors are the persons who know what really happened. *Allowing [jurors] to testify as to matters other than their own reactions involves no particular hazard to the values sought to be protected. The rule is based upon this conclusion.* For example, under this rule jurors would be competent to testify to the consumption of alcoholic beverages by deliberating jurors, a matter which under some circumstances may be cause for setting aside a verdict, see *Kealoha v. Tanaka*, 45 H[aw]. 457, 370 P.2d 468 (1962). A similar rule is found in Cal. Evid.Code § 1150.

(Emphases added.) HRE Rule 606(b) is modeled on the original proposal for FRE Rule 606(b). As noted by the Advisory Committee, the values inhering in that proposal "include *freedom of deliberation*, stability and finality of verdicts, and *protection of jurors against annoyance and embarrassment.*" (Emphases added.) Those values, then, are also incorporated in HRE Rule 606(b).

Hence, HRE Rule 606(b) was not intended to shield, from the court's purview, proceedings in which jurors have been coerced or intimidated. A juror's impartial evaluation of the case should turn on the facts and the evidence, not on harassment or coercion. Justice is not served if the fate of a defendant is decided by the juror who bullies, intimidates, or curses at others. Thus, that jurors may not testify as to the effect of the improper statement upon them, does not mean that jurors may not testify about incidents of jury misconduct during deliberations.[5] There is no other way in which a court may determine objectively whether jurors' statements were used as a circumstance against a defendant.

## II.

Second, the alleged introduction of extraneous information to prove an element of the offense by Juror Ten and the foreperson also provided a proper ground for an evidentiary hearing. The court told the jurors, "[Y]our decision making in this case as it pertains to [Defendant] is limited just to what comes out in evidence and the law that applies to that." The court asked, "Would any of you have a problem in making your decision in this case about [Defendant] *just on the evidence that comes out in court* and the instructions that apply to that evidence? Because that's how you make your decision. Anyone have a problem with that?" (Emphasis added.) The jurors all answered, "No."

Despite those admonitions by the court, Juror Ten and the foreperson tainted the deliberations by introducing their outside experience with guns to persuade the other jurors that Defendant possessed the requisite *intent* to commit the crimes charged:

> At that point, *[Juror Ten] again in a very forceful manner started talking about how he on a weekly basis went to the shooting range and fired firearms.* And in a very heated manner again, saying, Do you know the type of damage that a magnum can do? That that can do so much damage, that is a deadly weapon, and *if anyone uses a magnum, they had to have a deadly intent. [The foreperson] also discussed his experience with firearms,* and again supporting [Juror Ten]'s assertions that *it was a very dangerous weapon and that again relying on his personal experience, that it had to have been an intentional or knowing shooting.*

(Emphases added.) Jurors are permitted to weigh only the evidence presented at trial in determining whether or not a defendant committed the charged offense or whether an element of that offense has been proven. The prosecution has the burden of proving its case at trial; it may not rely on any extraneous information that may prejudice the defendant. But, in fact, according to the offer of proof, the foreperson argued to the

---

5. HRE Rule 606(b) does not prohibit a juror from testifying about any matter or statement made during deliberations, but only "the *effect* of anything upon the juror's or any other juror's mind or emotions as *influencing* the juror to assent to or dissent from a verdict...." (Emphases added.) The offer of proof here was as to the matters that took place before the jury and, thus, such matters could be described and proffered as improper. *See supra* page 294, 81 P.3d page 1209.

jurors that, based on *his* experience with guns, "it had to have been an intentional or knowing shooting."

Our law permits a juror to testify as to extraneous information introduced into the deliberations. Such testimony would exemplify the "objective misconduct" described in the commentary to HRE Rule 606(b). But the majority appears to gloss over this issue. Even the exception drawn in FRE Rule 606(b), permits testimony on "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." FRE Rule 606(b).

### III.

In arguing their experiences with firearms in the deliberations, the foreperson and Juror Ten implicated for consideration their voir dire promises not to do so. Juror Ten was specifically questioned during voir dire about such experience and responded he could set such matters aside:

[PROSECUTION]: ... *Can you kind of put aside everything you know about firearms in your personal life and private life and rely on what you hear in court?*

[JUROR TEN]: Well, I could try, but I've, you know, been in a lot of arguments with my friends where most of them are against it and it causes you to want to defend what you do in your pastime.

[PROSECUTION]: Sure. Oh, you mean about gun control, that they have of guns?

[JUROR TEN]: Yeah.

[PROSECUTION]: *That won't be an issue here?*

[JUROR TEN]: *Uh-uh.*

[PROSECUTION]: Except as far as one of the charges is a possessory type offense. Would you have any trouble with that?

[JUROR TEN]: Um, I'm not sure. I can try. That's why I didn't raise my hand before. *But I can try.*

[PROSECUTION]: *You think you might have any difficulty following the law as the judge gives it to you?*

[JUROR TEN]: *Probably not.*

. . . .

[DEFENSE]: *What are you going to look for then?*

[JUROR TEN]: *How they present themselves, quality of what they say, what everyone said.*

(Emphases added.)

The foreperson was asked by the court, "Is there anything ... that you can think of that would interfere with or prevent you from being fair and impartial if you were called upon to be a juror in this case?" The foreperson responded, "No." The court asked, "Do you believe you can be fair and impartial if you were called upon to do so?" The foreperson stated, "Yes." In voir dire, the foreperson *indicated his exposure to guns would not affect his deliberations:*

[PROSECUTOR]: So you are familiar with guns?

[THE FOREPERSON]: Yes.

[PROSECUTOR]: All right. What type of firearms do you use?

[THE FOREPERSON]: Um, 20 gauge, 12 gauge.

[PROSECUTOR]: Any familiarity with handguns at all?

[THE FOREPERSON]: Um, well I was in the military before.

[PROSECUTOR]: Okay.

[THE FOREPERSON]: And I was classified as a sharp shooter.

[PROSECUTOR]: So you're a good shot then?

[THE FOREPERSON]: Yeah.

[PROSECUTOR]: I'll keep that in mind. Did you—in the military you carried a handgun; right?

[THE FOREPERSON]: A rifle, M-16.

[PROSECUTOR]: You didn't have a handgun?

[THE FOREPERSON]: No.

[PROSECUTOR]: Were you trained in the use of a handgun in the military?

[THE FOREPERSON]: No.

[PROSECUTOR]: Okay. *Have you ever fired a handgun?*

[THE FOREPERSON]: *Um, once.*

[PROSECUTOR]: Okay. *Anything about your exposure to firearms,* and we have a few people who have, *anything that would cause that to affect your decision making in this case if you're selected as a juror?*

[THE FOREPERSON]: *No.*

. . . .

[PROSECUTOR]: ... And we know what the truth is. Can you search in this case for the truth?

[THE FOREPERSON]: Yes.

. . . .

[DEFENSE]: ... would you be able to ... pay attention and fulfill the duties of a juror as required?

[THE FOREPERSON]: Oh, yes.

[DEFENSE]: You can do that?

[THE FOREPERSON]: Yeah.

[DEFENSE]: That won't be a problem?

[THE FOREPERSON]: No.

[DEFENSE]: Well, *how do you decide if someone is believable or not or whether something is believable when you search for the truth? What are you going to look for?*

[THE FOREPERSON]: Um, the same as what the other jurors said yesterday— *body language, facial expressions, also what they say, their testimony.*

[DEFENSE]: Um-hmm. Um-hmm. Okay. Think you can do that in this case?

[THE FOREPERSON]: Yeah.

. . . .

[DEFENSE]: Okay. You know, *we talked some, maybe a lot, about presumption of innocence, the burden of proof. Are you going to be able to hold the prosecution to its burden of proof, beyond a reasonable doubt?*

[THE FOREPERSON]: ... *Oh, yes.*

. . . .

[DEFENSE]: *Okay. Can you keep an open mind?*

[THE FOREPERSON]: *Yes, I can.*

(Emphases added.)

This court has stated that, "[g]lobally speaking, 'proof that a juror was biased against the defendant or lied on voir dire [to

the defendant's prejudice] entitles the defendant to a new trial[,]' " *Furutani,* 76 Hawai'i at 181, 873 P.2d at 60 (internal citation omitted), and that "the *trial court must grant a motion for [a] new trial if any member (or members) of the jury was not impartial;* failure to do so *necessarily constitutes an abuse of discretion.*" *Id.* at 179, 873 P.2d at 58 (citing *State v. Sugiyama,* 71 Haw. 389, 391, 791 P.2d 1266, 1267 (1990)). In *Furutani,* this court stated that

> when a criminal defendant makes a *prima facie* showing that improper juror comments during deliberations have been used as a circumstance against him or her, *there is a presumption of prejudice and the verdict will be set aside unless it is clearly shown that the juror's [comments] could not have affected the verdict.* And consistent with our case law, *the burden is on the prosecution to make such a clear showing beyond a reasonable doubt.*

*Id.* at 185–86, 873 P.2d at 64–65 (emphases added) (internal quotation marks and citations omitted). Juror Ten's and the foreperson's arguments to the other jurors based on their experiences with guns were clearly improper and, hence, a presumption of prejudice arose. Similarly, in *Furutani,* the circuit court found, *inter alia,*

> [t]hat *counsel for [Furutani] did, during voir dire, obtain a commitment from the jurors that they would not hold [Furutani's] failure to testify ... against him ...,* [t]hat during voir dire, the jurors responded "Yes" when asked by defense counsel if they thought it was fair that a defendant did not have to testify....

*Id.* at 178, 873 P.2d at 57. Accordingly, the circuit court determined "that the possible misconduct at voir dire and the misconduct during deliberations deprived [defendant] of a trial by twelve fair and impartial jurors," *id.,* a finding upheld on appeal, *id.* at 185, 873 P.2d at 64. This court went on to state that

> [w]hen used as a circumstance against the accused, a juror's comments regarding a defendant's failure to testify are *presumptively prejudicial* because they constitute an *ipso facto* demonstration that *the juror could not be ... impartial and would have*

*been excused for cause had the juror's bias been made known during voir dire.*

*Id.* at 186, 873 P.2d at 65 (emphases added) (internal quotation marks and citations omitted). In this case, evidence of Juror Ten's and the foreperson's bias, if made known in voir dire, would have resulted in their being excused.

### IV.

In light of Juror Ten's alleged intimidation, along with his, and the foreperson's, introduction of extraneous information, there is prima facie evidence "that improper juror comments during deliberations [were] used as a circumstance against the defendant." *State v. Gabalis,* 83 Hawai'i 40, 46, 924 P.2d 534, 540 (1996) (internal quotation marks and citations omitted). The comments went directly to a verdict on a greater offense as opposed to a lesser offense. Such objective misconduct and irregularities are the proper objects of an evidentiary hearing. Juror conduct that taints the integrity of the verdict manifestly redounds to the defendant's detriment. Therefore, an assessment of the jurors' statements during deliberations must be made in this case. *See Gabalis,* 83 Hawai'i at 45–46, 924 P.2d at 539–40; *Jackson,* 81 Hawai'i at 48, 912 P.2d at 80.

### V.

The majority states that "public policy demands that the sanctity of jury deliberation be vigorously guarded to ensure frankness and open discussion." Majority opinion at 292, 81 P.3d at 1207. In doing so, the majority cites federal cases rather than Hawai'i cases. Those federal cases are inapposite. In *United States v. Barber,* 668 F.2d 778 (4th Cir.1982), the court determined that one juror's post-verdict "anguish over participation in the verdict" and another juror's indication to a news reporter that "she had been threatened by the foreman of the jury to report her to the judge" could not be reviewed in light of

> [FRE] 606(b)[, which] provides that a juror may not impeach the jury's verdict by testifying "as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything

upon his or any other juror's mind or emotions as influencing him to assent to . . . the verdict."

*Id.* at 786–87 (emphasis added). This reasoning is not applicable here, however, because HRE Rule 606(b) does not include the quoted provision of FRE Rule 606(b). Our rule does not prohibit a juror testifying as to the internal deliberations of the jury. By relying on *Barber,* the majority in effect imports the greater restrictive scope of FRE 606(b) into HRE 606(b).

The majority also cites to *McDonald v. Pless,* 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915), in which the jury awarded the plaintiff the amount that constituted the average of the amounts the jurors would award independently. Some jurors disapproved of the fact that some amounts indicated by some of the jurors were higher than the amount sought by the plaintiff and were dissatisfied with the result. The defendant moved to set aside the verdict but the court did not allow the jurors to testify at the hearing of the motion, which the reviewing court affirmed. It should be noted that *Pless* is a civil case (rather than a criminal case) and is a decision that pre-dates the Federal Rules of Evidence. Moreover, the *Pless* Court conceded that "there might be instances in which such testimony of the juror could not be excluded without violating the plainest principles of justice . . . which might occur in the gravest and most important cases." *Id.* at 268–69, 35 S.Ct. 783 (internal quotation marks omitted). Therefore, the Court did not "attempt[ ] to define the exceptions, or to determine how far such evidence might be received by the judge on his own motion." *Id.* at 269, 35 S.Ct. 783. Rather, the Court explained that its holding did not apply to criminal cases:

> The suggestion that, if this be the true rule, then jurors could not be witnesses in criminal cases, or in contempt proceeding brought to punish the wrongdoers, *is without foundation.* For *the principle is limited to those instances in which a private party seeks to use a juror as a witness to impeach the verdict.*

*Id.* (emphases added). Plainly, *Pless* is not applicable to this case.

## VI.

This decision will have a substantial impact on a juror's jury experience. That jury deliberations may be "contentious" or "even offensive" is not disputed. Majority opinion at 292, 81 P.3d at 1207. But to permit jurors to intimidate their fellow jurors goes beyond what is permissible. *See Rudnick, supra,* page 295 and note 3, 81 P.3d at page 1210 and note 3. It is not only detrimental to a defendant's right to a fair trial, but also infringes upon a juror's right to serve. This court has stated that the "privilege to serve as a juror in the courts of Hawai'i belongs to one as a citizen of the State of Hawai'i." *State v. Johnston,* 51 Haw. 195, 201, 456 P.2d 805, 809 (1969). Similarly, the United States Supreme Court has held pursuant to the Fourteenth Amendment Equal Protection Clause, that all people have the "same right and opportunity to participate in the administration of justice enjoyed by the [entire] population." *Batson v. Kentucky,* 476 U.S. 79, 91, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In light of this guarantee, we are duty-bound to prevent coercive conduct of fellow jurors from encroaching on a juror's right to participate in the administration of justice.

Our judicial system requires that citizens take time from their daily obligations to serve on juries. Jury duty is often quite burdensome, requiring significant amounts of time, and often personal and financial sacrifices. It is each court's responsibility as it is this court's, to protect a juror's right to deliberate free from harassment while fulfilling his or her civic duty.

## VII.

More than juror "regret," majority opinion at 293, 81 P.3d at 1208, is involved here. The reasoned application of HRE Rule 606(b) is what is called for rather than the specter of an "inundat[ion] . . . of new trials." Majority opinion at 293, 81 P.3d at 1208. HRE Rule 606(b) is not intended to permit an inquiry into all jury deliberations where more assertive jurors persuade other jurors. Rather, each situation must be evaluated on a case-by-case basis. Plainly, the facts alleged in this case, on their face, warrant an evidentiary hearing. Accordingly, I would remand for that purpose. On the present record, the verdict rendered under the circumstances of this case is not worthy of such designation.